**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| Alexander Aguilar, et al., | : | |
| | : | |
| Plaintiffs, | : | **No. 3:07-cv-0193** |
| | : | |
| -against- | : | |
| | : | |
| Imperial Nurseries, et al., | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' MOTION FOR RULE 55(b) DEFAULT JUDGMENT**

Plaintiffs hereby move for a Rule 55(b) default judgment against Defendants William Forero, Hernando Aranda, and Pro Tree Forestry LLC ("Pro Tree").

- Plaintiff Alexander Aguilar seeks a joint and several judgment in the amount of $691,166.85 against Defendants Forero, Aranda, and Pro Tree.

- Plaintiff Carlos Aguilar seeks a joint and several judgment in the amount of $401,061.59 against Defendants Forero, Aranda, and Pro Tree.

- Plaintiff Leopoldo Santos Catu seeks a joint and several judgment in the amount of $671,620.10 against Defendants Forero, Aranda, and Pro Tree.

- Plaintiff Santos Chajchaguin seeks a joint and several judgment in the amount of $836,472.30 against Defendants Forero, Aranda, and Pro Tree.

- Plaintiff Marvin Coto seeks a joint and several judgment in the amount of $841,599.73 against Defendants Forero, Aranda, and Pro Tree.

- Plaintiff Esteban Espinoza seeks a joint and several judgment in the amount of $399,507.82 against Defendants Forero, Aranda, and Pro Tree.

1

- Plaintiff Walter Hernandez seeks a joint and several judgment in the amount of $839,269.08 against Defendants Forero, Aranda, and Pro Tree.

- Plaintiff Angel Mendoza seeks a joint and several judgment in the amount of $838,336.82 against Defendants Forero, Aranda, and Pro Tree.

- Plaintiff Hugo Oreno seeks a joint and several judgment in the amount of $691,432.95 against Defendants Forero, Aranda, and Pro Tree.

- Plaintiff Carlos Pinto seeks a joint and several judgment in the amount of $398,420.19 against Defendants Forero, Aranda, and Pro Tree.

- Plaintiff Hector Rodas Lopez seeks a joint and several judgment in the amount of $398,886.32 against Defendants Forero, Aranda, and Pro Tree.

- Plaintiff Luis Amilcar Rodriguez seeks a joint and several judgment in the amount of $837,706.31 against Defendants Forero, Aranda, and Pro Tree.

The total judgment Plaintiffs seek is $7,845,480.06 against Defendants Forero, Aranda, and Pro Tree.

In support of this motion, Plaintiffs submit the attached proposed order and the attached Memorandum of Law in Support of Plaintiffs' Motion for Rule 55(b) Default Judgment.

Dated: January 24, 2008

                                         _____
                                         Michael J. Wishnie, ct27221
                                         Supervising Attorney
                                         Jerome N. Frank Legal Services Organization
                                         Yale Law School
                                         127 Wall St.
                                         New Haven, CT 06511
                                         (203) 432-4800

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Alexander Aguilar, et al., | : | |
| | : | |
| Plaintiffs, | : | **No. 3:07-cv-0193** |
| | : | |
| -against- | : | |
| | : | |
| Imperial Nurseries, et al., | : | |
| | : | |
| Defendants. | : | |

## [proposed] ORDER GRANTING DEFAULT JUDGMENT

UPON CONSIDERATION of the Motion for Rule 55(b) Default Judgment, memorandum of law, and declarations and exhibits submitted herein, it is hereby ORDERED that the Motion is GRANTED. UPON CONSIDERATION of the Motion for Rule 55(b) Default Judgment, memorandum of law, and declarations and exhibits submitted herein, it is hereby ORDERED that the Motion is GRANTED. Default judgment is entered, jointly and severally, against Defendants William Forero, Hernando Aranda, and Pro Tree Forestry Services LLC in favor of Plaintiffs in the following amounts:

- Alexander Aguilar in the amount of $691,166.85 or _____ .

- Carlos Aguilar in the amount of $401,061.59 or _____ .

- Leopoldo Santos Catu in the amount of $671,620.10 or _____ .

- Santos Chajchaguin in the amount of $836,472.30 or _____ .

- Marvin Coto in the amount of $841,599.73 or _____ .

- Esteban Espinoza in the amount of $399,507.82 or _____ .

- Walter Hernandez in the amount of $839,269.08 or _____ .

1

- Angel Mendoza in the amount of $838,336.82 or _____ .

- Hugo Oreno in the amount of $691,432.95 or _____ .

- Carlos Pinto in the amount of $398,420.19 or _____ .

- Hector Rodas Lopez in the amount of $398,886.32 or _____ .

- Luis Amilcar Rodriquez in the amount of $837,706.31 or _____ .

The total judgment will be in the amount of $7,845,480.06 or _____ .

ENTERED this ___ day of _____ , 2008.


_____
Janet C. Hall
United States District Judge

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Alexander Aguilar, et al., | : | |
| | : | |
| Plaintiffs, | : | **No. 3:07-cv-0193** |
| | : | |
| -against- | : | |
| | : | |
| Imperial Nurseries, et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR RULE 55(b) DEFAULT JUDGMENT

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................................................iv

STATEMENT ...................................................................................................................1

INTRODUCTION .............................................................................................................2

FACTUAL BACKGROUND .............................................................................................3

    I.   Procedural History ................................................................................................3

    II.  Statement of Facts................................................................................................4

    III. The Settlement with Imperial Defendants..............................................................9

ARGUMENT ..................................................................................................................10

    I.   Standard for Entry of 55(b) Default Judgment..................................................11

    II.  Claim-by-Claim Analysis ..................................................................................12

        a.  TVPA: Forced Labor In Violation Of Federal Law (18 U.S.C. § 1589) (Claim 14)...................................................................................................................12

            i.  Forced Labor Is a Violation of Federal Law for Which Defendants Are Civilly Liable.......................................................................................13

            ii.  The Pro Tree Defendants Committed Forced Labor in Violation of Federal Law.......................................................................................14

            iii.  Appropriate Damages for Federal Forced Labor Claim. ............................17

        b.  TVPA: Human Trafficking In Violation of Federal Law (18 U.S.C. § 1590) (Claim 15)..........................................................................................................22

            i.  The Pro Tree Defendants Committed Human Trafficking in Violation of Federal Law.......................................................................................22

            ii.  Appropriate Damages for Federal Human Trafficking Claims. ..................24

        c.  Alien Tort Claims Act: Involuntary Servitude And Forced Labor In Violation Of International Law (28 U.S.C. § 1350) (Claim 16). .................................................27

            i.  The International Norm Prohibiting Involuntary Servitude and Forced Labor Is Actionable Under ATCA. .......................................................28

            ii.  The Pro Tree Defendants Committed Involuntary Servitude and Forced Labor in Violation of International Law. ...............................................30

            iii.  Appropriate Damages for ATCA Involuntary Servitude and Forced Labor Violations.......................................................................................31

        d.  Alien Tort Claims Act: Human Trafficking in Violation of International Law (28 U.S.C. § 1350) (Claim 17)..........................................................................32

            i.  The International Norm Prohibiting Human Trafficking Is Actionable Under the ATCA. .............................................................................32

ii.  The Pro Tree Defendants Committed Human Trafficking in Violation of International Law..............................................................................34

iii.  Appropriate Damages for ATCA Human Trafficking Violations................36

e.  Federal RICO (Pro Tree as the Enterprise) (Claim 19). ...........................36

i.  The Pro Tree Defendants' Activities Satisfy All Elements of the Civil RICO Offense..............................................................................36

ii.  The Pro Tree Defendants Committed Sufficient Predicate Acts to Violate RICO.................................................................................39

iii.  The Pro Tree Defendants Engaged in a Continuous Pattern of Racketeering Activity ...................................................................44

iv.  Appropriate Damages for the Pro Tree Defendants' Racketeering Activities. ...................................................................................46

f.  Fraud (Claims 7 and 8)..........................................................................47

i.  The Pro Tree Defendants Committed Fraud by Making Misrepresentations to the Plaintiffs. ................................................47

ii.  Plaintiffs Are Entitled to Damages for the Fraud Claims. ...................51

g.  Intentional Infliction of Emotional Distress (Claim 10)...........................53

i.  The Pro Tree Defendants Are Liable for Intentional Infliction of Emotional Distress..........................................................................53

ii.  Appropriate Damages for Intentional Infliction of Emotional Distress. .......57

h.  Negligent Infliction of Emotional Distress (Claim 11). ..........................58

i.  Guatemalan Labor Code (Claim 20). .....................................................59

i.  This Court Has Supplemental Jurisdiction to Hear Foreign Law Claims.......60

ii.  The Pro Tree Defendants Are Liable for Violating the Guatemala Labor Code...................................................................................63

III.  Calculation of Damages ...........................................................................64

a.  Forced Labor ........................................................................................65

b.  Human Trafficking ...............................................................................66

c.  Travel Expenses....................................................................................68

d.  Interest .................................................................................................69

e.  Total Damages......................................................................................75

CONCLUSION ...................................................................................................76

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 2003) ..................................... 31

*Adams v. Yale New Haven Hospital*, No. 06-1166, 2007 WL. 201244
 (D. Conn. Jan. 22, 2007) ...................................................................... 59

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005) ........... 31

*Anatian v. Coutts Bank (Switz.) Ltd.*, 193 F.3d 85 (2d Cir. 1999) ................................... 37

*Arce v. Garcia*, 434 F.3d 1254 (11th Cir. 2006) ............................................................ 31

*Atlantic Mutual Insurance Co. v. Napa Transport, Inc.*, 399 F. Supp. 2d 523
 (S.D.N.Y. 2005), *aff'd*, 2006 WL 2918940 (2d Cir. 2006) ................................. 68, 69

*Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61 (2d Cir. 1981) ....................................... 11

*Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849 (2d Cir. 1995) .............................. 11

*Barcia v. Sitkin*, No. 79-5831, 1997 U.S. Dist. LEXIS 1611
 (S.D.N.Y. Feb. 14, 1997) ........................................................................ 72

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004) ................. 60

*Catalan v. Vermillion Ranch Ltd. Partnership*, No. 06-01043, 2007 WL. 38135
 (D. Colo. Jan. 4, 2007) ........................................................................... 13

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) ..................................... 37

*Chance v. AMLI/BPMT Breckenridge Partnership*, No. 05-00464, 2007 WL.
 755404 (E.D. Tex. Jan. 16, 2007) ............................................................ 26

*Chavez v. Carranza*, No. 03-2932, 2006 WL 2434934
 (W.D. Tenn. Aug. 15, 2006) ................................................................... 31

*City of Chicago v. International College of Surgeons*, 522 U.S. 156 (1997) .................. 60

*Crocco v. Advance Stores Co. Inc.*, No. 04-1608, 2007 WL. 869062 (D. Conn.
 Mar. 20, 2007) ....................................................................................... 62

iv

*Diversified Carting, Inc. v. City of New York*, 423 F. Supp. 2d 85 (S.D.N.Y. 2005) ................................................................................................ 60

*Doe v. Reddy*, No. 02-5570, 2003 WL 23893010 (N.D. Cal. Aug. 4, 2003)............ 28, 32

*Doe I v. Unocal Corp.*, 395 F.3d 932 (9th Cir. 2002), *vacated by grant of rehearing en banc*, 395 F.3d 978 (2003), *appeal dismissed*, 403 F.3d 708 (2005)............................................................................................................ 28, 29

*Enron Oil Corp. v. Diakuhara*, 10 F.3d 90 (2d Cir. 1993)............................................ 11

*In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467 (9th Cir. 1994)............. 28

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) ...................................................... 33

*GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463 (2d Cir. 1995)........................................................................................................ 44

*Gatti v. Community Action Agency of Greene County, Inc.*, 263 F. Supp. 2d 496 (N.D.N.Y. 2003)...................................................................... 72

*Greyhound Exhibitgroup*, 973 F.3d at 158 ...................................................................... 11

*Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155 (2d Cir. 1992)........................................................................................................................ 11

*H. J. Inc. v. Northwestern Bell Telegraph Co.*, 492 U.S. 229 (1989) ....................... 43, 44

*Independent Bulk Transport, Inc. v. Vessel "Morania Abaco,"*, 676 F.2d 23 (2d Cir. 1982)................................................................................................................ 70

*Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424 (D.N.J. 1999).............................. 28, 29

*Jacobson v. Cooper*, 882 F.2d 717 (2d Cir. 1989)........................................................... 45

*Jones v. UNUM Life Insurance Co. of America*, 223 F.3d 130 (2d Cir. 2000) ............... 69

*Kadic v. Karadic*, 70 F.3d 232 (2d Cir. 1995) ................................................................. 29

*Kirschner v. Klemons*, 225 F.3d 227 (2d Cir. 2000) ....................................................... 60

*Malarkey v. Texaco, Inc.*, 794 F. Supp. 1237 (S.D.N.Y. 1992), *aff'd*, 983 F.2d 1204 (2d Cir. 1993) ..................................................................................................... 69

*Medigene AG v. Loyola University of Chicago*, No. 98-2026, 2001 WL 1636916 (N.D. Ill. Dec. 19, 2001)......................................................................................... 61

*Mentor Insurance Co. v. Brannkasse*, 996 F.2d 506 (2d Cir. 1993)........................ 68, 70

*Metromedia Co. v. Fugazy*, 983 F.2d 350 (2d Cir. 1992) ................................ 44

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993) ........................ 40

*Mine Workers v. Gibbs*, 383 U.S. 715 (1966).................................................. 60

*N.Y. Marine & General Insurance Co. v. Tradeline L.L.C.*, 266 F.3d 112
  (2d Cir. 2001)........................................................................................... 69

*New York  v. Green*, 420 F.3d 99 (2d Cir. 2005) ........................................... 10

*Reves v. Ernst & Young*, 507 U.S. 170 (1993)................................................ 37

*Estate of Rodriquez v. Drummond Co., Inc.*, 256 F. Supp. 2d 1250
  (N.D. Ala. 2003)........................................................................................ 29

*S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629
  (2d Cir. 1996)........................................................................................... 40

*Sedima v. Imrex Co.*, 473 U.S. 479 (1985)........................................ 37, 45, 46

*Shah v. New York State Department of Civil Service*, 168 F.3d 610 (2d Cir. 1999) ........ 11

*Shaw v. Greenwich Anesthesiology Associates, P.C.*, 200 F. Supp. 2d 110 (D.
  Conn. 2002)............................................................................................... 69

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ..................... 40

*Shorter v. Hartford Financial Services Group Inc.*,
  2005 U.S. Dist. LEXIS 19902 (D. Conn. 2005) .......................... 68, 69, 72

*Small v. City of New York*, 274 F. Supp. 2d 271 (E.D.N.Y. 2003) ................... 62

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)....................................... 27, 32

*State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003)..........21

*Sullivan v. Metropolitan-North R. Co.*, 179 F. Supp. 2d 2 (D. Conn. 2002).................. 60

*Tafflin v. Levitt*, 493 U.S. 455 (1990)............................................................. 61

*Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir. 1993)...................... 11

*Topo v. Dhir*, No. 01-10881, 2003 U.S. Dist. LEXIS 21937
  (S.D.N.Y. Dec. 3, 2003) ............................................................... 32, 34

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*,
  109 F.3d 105 (2d Cir. 1997)............................................................ 11

*United States v. Amato*, 86 Fed. App'x 447 (2d Cir. 2004)............................ 44

*United States v. Borchers*, 163 F.2d 347 (2d Cir. 1947) .................................. 11

*United States v. Bradley*, 390 F.3d 145 (1st Cir. 2004), *vacated on other grounds*,
  545 U.S. 1101  (2005)...................................................................... 14

*United States v. Calimlim*, 2007 U.S. Dist. LEXIS 18933
  (E.D. Wis. Feb. 14, 2007) .................................................................. 18

*United States v. Evans*, 476 F.3d 1176 (11th Cir. 2007).................................. 34

*United States v. Garcia*, No. 02-110S-01, 2003 U.S. Dist. LEXIS 22088
  (W.D.N.Y. Dec. 2, 2003) .................................................................... 15

*United States v. Indelicato*, 865 F.2d 1370 (1989) ......................................... 43

*United States v. Jurado-Rodriguez*, 907 F. Supp. 568 (E.D.N.Y. 1995) ......................... 59

*United States v. Khalje*, 658 F.2d 90 (2d Cir. 1981)........................................ 39

*United States v. Kozminski*, 487 U.S. 931 (1988) ........................................... 16

*United States v. Long*, 917 F.2d 691 (2d Cir. 1990) .................................... 43, 44

*United States v. Maka*, 237 Fed. App'x 225, 227 (9th Cir. 2007) ............................ 22, 66

*United States v. Marcus*, 487 F. Supp. 2d 289 (E.D.N.Y. 2007)................................... 13

*United States v. Minicone*, 960 F.2d 1099 (2d Cir. 1992)................................. 44

*United States v. Turkette*, 452 U.S. 576 (1981) ............................................ 37

*United States v. West Indies Transport*, 127 F.3d 299 (3d Cir. 1997) ............................ 39

*Voda v. Cordis Corp.*, 476 F.3d 887 (Fed. Cir. 2007)....................................... 61

*Whallon v. Lynn*, 230 F.3d 450 (1st Cir. 2000)............................................. 59

*Wickham Contracting Co., Inc. v. Local Union No. 3, IBEW,*
 955 F.2d 831 (2d Cir. 1992)................................................................... 71, 72

*Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295 (D.N.J. 2005)............................. 15

## STATE CASES

*Airone v. Stop & Shop*, No. 86-0243869, 1989 WL. 989470
 (Conn. Super. Ct. May 8, 1989) .................................................................... 20

*Benton v. Simpson*, 78 Conn. App. 746 (2003)................................................. 53

*Berry v. Loiseau*, 223 Conn. 786 (Conn. 1992)...........................................53, 55, 56, 57

*Brouwer v. Haddam Hills Academy*, 2002 WL. 180974 (Conn. Super. 2002)........... 55, 56

*Carr v. Fleet Bank*, 73 Conn. App. 593 (2002) ............................................... 46

*Carrol v. Allstate Insurance Co.*, 262 Conn. 433 (2003) ................................... 57

*Chase Manhattan Mortg. Corp. v Machado*, 83 Conn. App. 183 (2004) ...................... 46

*Chykirda v. Yanush*, 131 Conn. 565, 41 A.2d 449 (1945).................................. 52

*Collens v. New Canaan Water Co.*, 155 Conn. 477 (1967)............................... 51

*DeDantis v. Piccadilly Land Corp.*, 3 Conn. App. 310 (1985) ........................... 51

*Doe v. K-Mart Corp.*, No. 95-CP-10-2590, 1997 WL. 744394
 (S.C. Com. Pl. Oct. 9, 1997) ...................................................................... 26

*Gagnon v. Housatonic Valley Tourism District Com'n*, 92 Conn. App. 835 (2006)........ 52

*Harris v. Harris*, 2007 Conn. Super. LEXIS 2580 (Oct. 2, 2007)................................. 71

*Larobina v. McDonald*, 274 Conn. 394 (2005) ............................................... 58

*Lucarelli v. Stop & Shop*, 1997 WL. 293974 (Conn. Super. Ct. Feb. 1997)................... 20

*Morrissey v. Yale University*, 268 Conn. 426 (2004)....................................... 53

*Oakes v. New England Dairies, Inc.*, 219 Conn. 1 (1991) ............................... 56

*Patron v. Konover*, 35 Conn. App. 504 (1994)................................................ 70

*Perodeau v. Hartford*, 259 Conn. 729 (2002)................................................. 57

*Petyan v. Ellis*, 200 Conn. 243 (1986) ........................................................ 52

*Rivera v. Double A Transport, Inc.*, 248 Conn. 21 (Conn. 1999) ................... 20

*Schnabel v. Tyler*, 630 A.2d 1361 (Conn. App. 1993) ................................... 20

*Stephan v.  Pennsylvania General Insurance Co.*, 224 Conn. 758 (1993) ...... 69

*Tyler v. Schnabel*, No. 88-0349210S, 1991 WL. 1168204
    (Conn. Super. Ct. Dec. 13, 1991) ............................................................ 20

*Uva v. Marriott Hotels, Inc.*, , No. 93-776-CI-15, 1995 WL. 807024 (Fl. Cir. Ct.
    Aug. 24, 1995) ......................................................................................... 25

*Valentino v. Charette*, 43 Conn. L. Rptr. 681 (Conn. Super. June 26, 2007) .. 58

*Wedig v. Brinster*, 469 A.2d 783 (Conn. App. 1983) .................................... 52

*Zulawski v. Stancil*, No. 05-000203S, 2006 WL. 2089470
    (Ct. Super. Ct. July 14, 2006) ................................................................. 53

## DOCKETED CASES

*Rogers v. Lawrence*, No. 84-1029W (D. Mass. Dec. 6, 1985) ........................ 19

*United States v. Calimlim et al.*, No. 04-CR-248, at PAGE (E.D. Wis. Dec. 4 )
    (copy attached as Exhibit U to the Hallett Decl.) ..................................... 18

## FEDERAL STATUTES AND REGULATIONS

8 U.S.C. § 1101(a)(15)(T) ...................................................................... 17, 41

8 U.S.C. § 1324(a) ....................................................................................... 18

18 U.S.C. § 2(b) ........................................................................................... 39

18 U.S.C. § 1201(a) ..................................................................................... 25

18 U.S.C. § 1341 .......................................................................................... 38

18 U.S.C. § 1343 .......................................................................................... 39

18 U.S.C. § 1546 ..................................................................................... 38, 39

18 U.S.C. § 1589 .................................................................................... *passim*

18 U.S.C. § 1590 ..................................................................................... *passim*

18 U.S.C. § 1591 ............................................................................................ 43

18 U.S.C. § 1593 ............................................................................................ 18

18 U.S.C. § 1595 ...................................................................................... 12, 22

18 U.S.C. § 1962 .................................................................................. 36, 37, 38

18 U.S.C. § 1964(c) ........................................................................................ 45

22 U.S.C. § 7101(b)(1) ................................................................................... 34

22 U.S.C. § 7102(8) ....................................................................................... 17

22 U.S.C. § 7105 ............................................................................................ 17

28 U.S.C. § 1367 .................................................................................... *passim*

28 U.S.C. § 1961 ...................................................................................... 69, 71

Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-
    193, § 5, 117 Stat. 2875, 2878 (2003) ...................................................... 12

Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-
    386, 114 Stat. 1464 (2000) ....................................................................... 12

8 C.F.R. 214.2(h) ............................................................................................ 41

22 C.F.R. 41.103 ............................................................................................ 39

Fed. R. Civ. P. 44.1 ........................................................................................ 58

**STATE STATUTES**

Conn. Gen. Stat. § 37-3a ........................................................................... 69, 70

Conn. Gen. Stat. § 53-92a (2007) .................................................................. 25

**INTERNATIONAL MATERIALS**

American Convention on Human Rights, art. 6, Nov. 12, 1969,
    1114 U.N.T.S. 123 ................................................................................... 29

Convention for the Suppression of the Traffic in Persons and of the Exploitation
  of the Prostitution of Others, Dec. 2, 1949, 96 U.N.T.S. 271 .................................... 33

ILO Abolition of Forced Labour Convention (No. 105),
  June 26, 1957, 320 U.N.T.S. 291 ..................................................................... 28, 29

International Agreement for the Suppression of the "White Slave Traffic,"
  May 18, 1904, 35 Stat. 1979, 1 L.N.T.S. 83 ............................................................. 33

International Covenant on Civil and Political Rights, Dec. 16, 1966,
  993 U.N.T.S. 171 .................................................................................................. 28

International Covenant on Economic, Social and Cultural Rights,
  Dec. 16, 1966, 993 U.N.T.S. 3 .......................................................................... 28-29

International Convention for the Suppression of the "White Slave Traffic," Art. 1.
  May 4, 1910, 211 Consol. T.S. 45, 103 B.F.S.P. 244 ................................................ 33

Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially
  Women and Children, Supplementing the United Nations Convention Against
  Transnational Crime, Nov. 15, 2003,
  55 U.N. GAOR Supp. (No. 49) at 60, 40 I.L.M. 335 ................................................ 33

**MISCELLANEOUS**

Department of State, *Trafficking in Persons Report: June 2007* ..................................... 34

Krista Friedrich, *Statutes of Liberty?,* 72 Brooklyn L. Rev. 1139, 1151-52 (2007) ......... 12

Kelly E. Hyland, *Protecting Human Victims of Trafficking: An American
  Framework*, 16 Berkeley Women's L.J. 29, 51 ........................................................... 2

Kathleen Kim & Kusia Hreshchyshyn, *Human Trafficking Private Right of
  Action: Civil Rights for Trafficked Persons in the United States*, 16 Hastings
  Women's L.J. 1, 16 (2004) ..................................................................................... 21

Jennifer S. Nam, *The Case of the Missing Case: Examining the Civil Right of
  Action for Human Trafficking Victims,* 107 Colum. L. Rev. 1655, 1670 (2007) ........ 13

Note, *Remedying the Injustices of Human Trafficking Through Tort Law,* 119
  Harv. L. Rev. 2574, 2583-84 (2006) ....................................................................... 18

## **STATEMENT**

In the spring of 2006, the twelve Plaintiffs party to this lawsuit were among a group of Guatemalan men recruited to work for William Forero, Hernando Aranda, and Pro Tree Forestry Services LLC (collectively, the "Pro Tree Defendants" or "Defendants").  Offered the promise of temporary jobs in North Carolina and a better life for their families at home, they each took out significant loans and traveled to the United States.  They entered the United States lawfully on H-2B visas.  But the promises made by the Pro Tree Defendants quickly unraveled.  Upon arriving in North Carolina, the Plaintiffs were placed in a van and driven to Connecticut.  There, they found themselves forced to work at a nursery near Hartford, where they were paid far below what they had been promised.  The work days were long and harsh; many men became sick, but they were not provided with medical care.  Plaintiffs were routinely told that if they failed to work as directed, they would be arrested and deported, leaving them unable to repay the sizable loans that awaited at home.  The Pro Tree Defendants confiscated their passports to ensure that Plaintiffs would be unable to freely leave.  Plaintiffs were told that they were not legally permitted to travel, and if caught by U.S. authorities, they would be arrested.  The Pro Tree Defendants engineered this campaign of fear, forcing the Plaintiffs to labor against their will, in order to maximize their own profits.

Plaintiffs eventually escaped the situation.  Some of the Plaintiffs returned to Guatemala, traumatized and more deeply indebted than they had left.  Others remained in the United States and applied for T-Visas, a visa infrequently granted to individuals whom the Department of Homeland Security and the Department of Justice certify as victims of a severe form of human

1

trafficking.[1]  But the Department of Homeland Security and the Department of Justice certified these men as victims of human trafficking and approved their T-Visas.

The Plaintiffs also filed the present lawsuit to vindicate their rights.  Although Defendants Forero and Aranda appeared in this matter, they never responded.  Nonetheless, Forero and Aranda remain in the community, and Plaintiffs fear it is only a matter of time until they recruit a new group of men from Guatemala, subjecting them to the same exploitation.  To prevent Forero and Aranda from victimizing others like themselves, Plaintiffs seek an entry of default judgment to ensure that those who commit forced labor and human trafficking cannot continue about their business with impunity.

## INTRODUCTION

Plaintiffs first recount the procedural history of this matter, and then provide a summary of the relevant facts.  Plaintiffs next discuss the impact of their settlement with the Imperial Nurseries Defendants on the present motion.

Turning to the legal analysis, Plaintiffs first review the relevant standards for a Rule 55(b) motion.  Plaintiffs then examine each claim to demonstrate that the legal elements are satisfied.  Evidence for appropriate valuations of each claim is offered next.  Finally, Plaintiffs calculate the total damages they seek in this action.  Plaintiffs acknowledge that many of the claims set forth in this motion seek compensation for the same underlying injury.  Plaintiffs have exercised care in ensuring that they do not pursue double recovery for any injuries and will demonstrate these calculations.

---

[1] All eight Plaintiffs who applied for a T-Visa were approved by the Department of Homeland Security.  Four Plaintiffs decided to return to Guatemala to rejoin their families and consequently were not eligible to apply for T-Visas.

## FACTUAL BACKGROUND

### I.  PROCEDURAL HISTORY

Plaintiffs filed their Complaint on February 8, 2007.  [Docket #1].[2]  Defendants William

Forero and Hernando Aranda were served with Summonses and Complaints on February 12,

2007.  [Docket #10].  Their answers were due March 5, 2007.  Defendants Forero and Aranda

did not seek an extension of time, answer the complaint, or otherwise appear.  Defendant Pro

Tree was served with a Summons and Complaint on February 13, 2007.  [Docket #10].

Defendant Pro Tree's answer was also due March 5, 2007.  Defendant Pro Tree similarly did not

seek an extension of time, answer the complaint, or otherwise appear.  Plaintiffs filed a First

Amended Complaint on March 14, 2007.  [Docket #15].  On March 30, 2007, M.B. Adelson,

Esq., an attorney in Tallahassee, Florida, where Forero and Aranda reside, accepted service of

process of Summonses and First Amended Complaints for Defendants Forero, Aranda, and Pro

Tree.  [Docket #37].

The Pro Tree Defendants sought, and this court granted, three separate extensions to

answer the complaint.  [Docket #30, 38, 47].  After the Pro Tree Defendants still failed to

respond to this action, this Court entered a default on October 31, 2007.  [Docket #60].  On

November 28, this Court extended the time by which to file the present motion to and including

January 14, 2008.  [Docket #62].  On January 14, 2008, this Court extended the time by which to

file the present motion to and including January 24, 2008.  [Docket # 64].  Plaintiffs now

---

[2] On June 25, 2007, Plaintiffs and defendants Imperial Nurseries, Griffin Land & Nurseries, Gregory Schaan, Jim Wells, Frederick Danziger, and Anthony Galici (collectively, "the Imperial Defendants") stipulated a dismissal to this action.  [Docket #53].  This dismissal was executed pursuant to a settlement agreement reached between Plaintiffs and the Imperial Defendants.  As will be discussed in full, *infra* at Factual Background Part III, Plaintiffs do not seek recovery on certain claims that the Imperial Defendants settled.  Rather, Plaintiffs presently seek recovery solely for claims on which they have not been made whole.

respectfully request that this Court grant a Rule 55(b) default judgment against Pro Tree Defendants.

## II.  STATEMENT OF FACTS

The twelve named Plaintiffs are all citizens of Guatemala.  Am. Compl. ¶ 3.[3]  In early 2006,[4] the Plaintiffs were recruited by Guillermo Sazo, a Guatemala City-based recruiter who was acting as the agent for the Pro Tree Defendants.  *Id*. at 39-41. The recruiter offered the Plaintiffs jobs planting pine trees in North Carolina for Defendant Pro Tree Forestry Services. *Id*. ¶ 41.  The Plaintiffs were told that they would be paid approximately $7.50 per hour.  *Id*. ¶¶ 40-41, 46-48.  They accepted Defendants' offer of employment and, with Sazo's assistance, they applied for and received H-2B visas to the United States for temporary nonagricultural work. Plaintiffs had to pay for the visas and plane tickets themselves, for which many had to borrow significant amounts of money.  *Id*. ¶¶ 42-44, 48-49 (copies of the Plaintiffs' H-2B visas are attached as Exhibit Q to the Declaration of Nicole Hallett dated January 24, 2008 [hereafter "Hallett Decl."]).  *See generally* A. Aguilar Aff. ¶¶ 7-13 (copy attached as Exhibit A to Hallett Decl.); C. Aguilar Aff. ¶¶ 4-10 (copy attached as Exhibit B to Hallett Decl.); M. Coto Aff. ¶¶ 4-8 (copy attached as Exhibit E to Hallett Decl.); E. Espinoza Aff. ¶¶ 4-9 (copy attached as Exhibit F to Hallett Decl.); W. Hernandez Aff. ¶¶ 4-9 (copy attached as Exhibit G to Hallett Decl.); A. Mendoza Aff. ¶¶ 4-17 (copy attached as Exhibit H to Hallett Decl.); H. Oreno Aff. ¶¶ 4-17 (copy attached as Exhibit I to Hallett Decl.); C. Pinto Aff. ¶¶ 4-10 (copy attached as Exhibit J to Hallett Decl.); H. Rodas Aff. ¶¶ 7-10 (copy attached as Exhibit K to Hallett Decl.); L. Rodriguez Aff. ¶¶ 5-10 (copy attached as Exhibit L to Hallett Decl.).

---

[3] In a default judgment, all well-pleaded allegations are deemed admitted.
[4] Paragraph 40 of the First Am. Compl. contains an immaterial typographical error where it states that Plaintiffs were offered work by the Guatemalan recruiter in 2005; Plaintiffs were offered work in 2006.  Am. Compl. ¶ 40. *See, e.g.*, A. Aguilar Aff. ¶ 7; C. Aguilar Aff. ¶ 4; M. Coto Aff. ¶ 4; C. Pinto Aff. ¶ 5; A. Mendoza Aff. ¶ 4.

The first group of Plaintiffs to arrive in the United States entered the country on or about March 18, 2006.  This group included ten Plaintiffs: Carlos Aguilar, Luis Amilcar Rodriguez, Santos Chajchaguin, Marvin Coto, Esteban Espinoza, Walter Hernandez, Angel Mendoza, Carlos Pinto, Hector Rodas Lopez, and Leopoldo Santos Catu ("March Plaintiffs").  Am. Compl. ¶¶ 40, 50.  Upon the arrival of the March Plaintiffs in North Carolina, an agent of Pro Tree Forestry Services placed the men into a van and drove them—without their consent or knowledge of where they were going—to Hartford, Connecticut.  There, the March Plaintiffs were delivered into the control of William Forero and his agents and ordered into two small, unfurnished, and filthy apartments.  *Id.* ¶¶ 51-62; C. Aguilar Aff. ¶¶ 11-21; M. Coto Aff. ¶¶ 9-20; E. Espinoza Aff. ¶¶ 10-23; W. Hernandez Aff. ¶¶ 10-22; A. Mendoza Aff. ¶¶ 21-38; C. Pinto Aff. ¶¶ 11-22; H. Rodas Aff. ¶¶ 11-25; L. Rodriguez Aff. ¶¶ 11-20.  Four of these men—Esteban Espinoza, Carlos Aguilar, Carlos Pinto, and Hector Rodas Lopez—escaped their condition of forced labor in early April 2006.  Am. Compl. ¶¶ 169-70; C. Aguilar Aff. ¶¶ 71-76; E. Espinoza Aff. ¶¶ 57-61; C. Pinto Aff. ¶¶ 58-62; H. Rodas Aff. ¶¶ 52-57.  Following their escape, Pro Tree Defendants recruited additional men—including the other two Plaintiffs in this action, Hugo Oreno and Alexander Aguilar (the "April Plaintiffs")—to replace the four who had fled.  Am. Compl. ¶¶ 46-49; 65-68; A. Aguilar Aff. ¶¶ 7-13; H. Oreno Aff. ¶¶ 4-17.  The April Plaintiffs flew into Hartford on or about April 12, 2006, and were ordered to join the March Plaintiffs in the same apartments.  Am. Compl. ¶¶ 65-68; A. Aguilar Aff. ¶¶ 14-21; H. Oreno Aff. ¶¶ 18-24.

Once in Connecticut, the Pro Tree Defendants told all Plaintiffs that instead of planting pine trees in North Carolina, they would be working in the fields of Imperial Nurseries, a large commercial nursery operation in Granby, Connecticut, near Hartford.  Am. Compl. ¶¶ 69, 73. The Pro Tree Defendants told the men they would not be paid hourly, but based on what the

group produced as a whole. *Id.* ¶¶ 70-71, 73.  The Pro Tree Defendants then forced Plaintiffs to sign a contract written in English, a language the Plaintiffs did not understand.  Plaintiffs did not receive copies of the document. *Id.* ¶¶ 71-72, 74; *see also* A. Aguilar Aff. ¶¶ 22-24; C. Aguilar Aff. ¶¶ 22-28; M. Coto Aff. ¶¶ 21-22, 27-29; E. Espinoza Aff. ¶¶ 24-25, 29-33; W. Hernandez Aff. ¶¶ 23-25, 30-32; A. Mendoza Aff. ¶¶ 39-43; C. Pinto Aff. ¶¶ 23-24; H. Rodas Aff. ¶¶ 26-31; L. Rodriguez Aff. ¶¶ 21-23.

The Pro Tree Defendants exerted pervasive control over Plaintiffs to ensure that they could not escape.  To ensure that Plaintiffs were not free to leave, the Pro Tree Defendants confiscated Plaintiffs' passports.  Am. Compl. ¶¶ 78-79.  The Pro Tree Defendants stated that they had a legal right to retain these documents. *Id.* ¶¶ 80, 84; *see also* A. Aguilar Aff. ¶¶ 25-28; C. Aguilar Aff. ¶¶ 29-32; M. Coto Aff. ¶¶ 23-26; E. Espinoza Aff. ¶¶ 26-28; W. Hernandez Aff. ¶¶ 25-29; A. Mendoza Aff. ¶¶ 44-46; H. Oreno Aff. ¶¶ 25-29; C. Pinto Aff. ¶¶ 25-27; H. Rodas Aff. ¶¶ 32-35; L. Rodriguez Aff. ¶¶ 24-26.  Plaintiffs were told by others that many prior workers had run away from the Pro Tree Defendants because of the poor working conditions and minimal pay.  Am. Compl. ¶ 82; H. Oreno Aff. ¶ 9, 28.  Indeed, the Pro Tree Defendants made specific statements to Plaintiffs that they were retaining Plaintiffs' passports so that Plaintiffs would be unable to leave if they did not like the pay or working conditions.  Am. Compl. ¶ 81; *see also* M. Coto Aff. ¶ 25; A. Mendoza Aff. ¶ 45.  Accordingly, the Pro Tree Defendants confiscated Plaintiffs' passports with the intent of prohibiting Plaintiffs from escaping Defendants' control.  Am. Compl. ¶ 83.

In addition to retaining Plaintiffs' passports, the Pro Tree Defendants controlled Plaintiffs by threatening the abuse of legal process.  The Pro Tree Defendants threatened on numerous occasions to order Plaintiffs deported if they misbehaved. *Id.* ¶¶ 88, 102, 139-42, 146-49, 152;

*see also* A. Aguilar Aff. ¶¶ 47-62; C. Aguilar Aff. ¶¶ 57-63; E. Espinoza Aff. ¶¶ 51-56; W. Hernandez Aff. ¶¶ 45-49; A. Mendoza Aff. ¶¶ 49-63; H. Oreno Aff. ¶¶ 50-59; C. Pinto Aff. ¶¶ 54-57.  To intimidate Plaintiffs and keep them under his control, Defendant Forero told Plaintiffs that he had previously caused the arrest and/or deportation of several former workers who had disobeyed his orders.  Am. Compl. ¶ 103-04; *see also* A. Aguilar Aff. ¶¶ 54-56; M. Coto Aff. ¶¶ 37-38; W. Hernandez Aff. ¶¶ 47-49; A. Mendoza Aff. ¶¶ 57-58; H. Oreno Aff. ¶¶ 54-55.  On their one day off a week, Saturday, Plaintiffs' movement was restricted by the Pro Tree Defendants.  One of Defendants' agents often accompanied the Plaintiffs when they traveled outside of their apartment (for example, to the grocery store or laundromat) to ensure that they did not escape.  Am. Compl. ¶ 96; *see also* A. Aguilar Aff. ¶ 51; C. Aguilar Aff. ¶ 53; M. Coto Aff. ¶ 43; E. Espinoza Aff. ¶ 46; W. Hernandez Aff. ¶ 36; A. Mendoza Aff. ¶¶ 54-55.  The Pro Tree Defendants also told Plaintiffs that they were legally prohibited from taking city buses and that their visas did not give them legal authorization to travel on any route other than that between the apartment and jobsite.  Am. Compl. ¶¶ 97-101; *see also* M. Coto Aff. ¶ 44; W. Hernandez Aff. ¶ 40; A. Mendoza Aff. ¶¶ 52-54; C. Pinto Aff. ¶¶ 49-50.

In addition to the confiscation of passports and threats of deportation and/or arrest, the Pro Tree Defendants psychologically manipulated the Plaintiffs.  In order to pay for their visas and airfare to the United States, and to provide money for their families while they were away, the Plaintiffs had been forced to take out significant loans with high interest rates prior to leaving Guatemala, in some cases secured by essential property or assets such as a family home.  Am. Compl. ¶ 44-45; 48; *see also* C. Aguilar Aff. ¶ 88; M. Coto Aff. ¶ 67; W. Hernandez Aff. ¶¶ 9, 72-73.  The Pro Tree Defendants threatened Plaintiffs that if they did not continue working, or if they were deported, the Plaintiffs would never have the means to pay off these loans.  Am.

Compl. ¶ 138; *see also* C. Aguilar Aff. ¶ 63 ("I was always thinking about my debts and Forero knew it.  He even reminded me of my debts and how I would have no chance of repaying them if he sent me back to Guatemala."); W. Hernandez Aff. ¶ 55 ("If we complained [about the unpaid wages], Forero and Aranda told us that we were making more than we would be in Guatemala after they had us deported.  'How will you pay your loans?' they taunted us.").  The Plaintiffs therefore reasonably believed they could not leave the United States without first repaying these substantial debts.  The Pro Tree Defendants knew this and manipulated Plaintiffs accordingly to establish a condition of debt bondage over the Plaintiffs.

During their time at Imperial Nurseries, Plaintiffs worked an average of approximately seventy-eight hours per week.  Am. Compl. ¶¶ 108.  They were paid far below the applicable state and federal minimum wage, and were paid much less than they had been promised when they were recruited.  *Id*. ¶¶ 126-29, 131-32, 134, 136.  The Plaintiffs were verbally abused by the Pro Tree Defendants while working in the Imperial fields.  *Id*. ¶ 147-49.  When Plaintiffs complained about the working conditions, the Pro Tree Defendants would retaliate by imposing harsher conditions.  *Id*. ¶ 151-53.  These activities were designed to intimidate Plaintiffs.  *Id*. ¶ 154-55.

The Plaintiffs escaped from Defendants' control at different times.  Four Plaintiffs—Espinoza, Rodas, Pinto, and Carlos Aguilar—fled first, in April 2006.  *Id.* ¶¶ 169-70; *see also* C. Aguilar Aff. ¶¶ 71-76; E. Espinoza Aff. ¶¶ 57-61; H. Pinto Aff. ¶¶ 58-62; H. Rodas Aff. ¶¶ 52-57.  Before fleeing, all but Plaintiff Pinto obtained their passports from the Pro Tree Defendants who had confiscated them by pretending that they needed the passports to receive a money transfer from relatives in Guatemala.  Plaintiff Pinto was afraid to arouse Defendants' suspicions, and therefore decided to flee without his passport.  *See* C. Pinto Aff. ¶ 59.  After these four

8

Plaintiffs fled, Pro Tree Defendants falsely told the others that these four Plaintiffs had been caught, arrested, and placed into deportation proceedings by U.S. authorities.  Am. Compl. ¶ 172; A. Aguilar Aff. ¶¶ 54-56; W. Hernandez Aff. ¶¶ 48-49; A. Mendoza Aff. ¶¶ 56-58; H. Oreno Aff. ¶¶ 54-55.

Plaintiff Santos Catu was the next to leave in May 2006.  When Plaintiff Catu complained to Defendant Forero about the working conditions, Defendant Forero told Plaintiff Catu that he had no choice but to work or be sent home.  Am. Compl. ¶¶ 173-74.  Because Plaintiff Catu refused to continue working under such appalling conditions, Defendant Forero took him to the airport the following day and sent him back to Guatemala without paying his remaining wages.  *Id.*  Defendant Forero then told the remaining Plaintiffs that Plaintiff Catu had been forcibly deported by U.S. immigration authorities. *Id*. ¶ 175; M. Coto Aff. ¶ 38 ("Forero . . . told us that he had had Catu 'deported' and that he could do the same to us at any time."); H. Oreno Aff. ¶¶ 47, 49.

The remaining Plaintiffs remained in the control of Pro Tree Defendants until June 2006, at which time investigators from the U.S. Department of Labor paid a cursory visit to Imperial Nurseries, prompting the Pro Tree Defendants to return the Plaintiffs' passports.  Am. Compl. ¶ 176; *see also* A. Mendoza Aff. ¶ 82.  Shortly thereafter, the remaining Plaintiffs fled in secrecy. Am. Compl. ¶ 176; A. Aguilar Aff. ¶¶ 63-67; M. Coto Aff. ¶¶ 58-61; W. Hernandez Aff. ¶¶ 62-64; A. Mendoza Aff. ¶¶ 83-86; H. Oreno Aff. ¶¶ 64-68; L. Rodriguez Aff. ¶¶ 54-57.

### III.  THE SETTLEMENT WITH IMPERIAL DEFENDANTS

In addition to the present claims against the Pro Tree Defendants, Plaintiffs also brought suit against Imperial Nurseries, Griffin Land & Nurseries, Frederick M. Danziger, Gregory M. Schaan, Anthony J. Galici, and Jim Wells (collectively, the "Imperial Defendants").  On June 25,

2007, Plaintiffs and the Imperial Defendants entered a stipulation of dismissal pursuant to a confidential settlement agreement, which this Court so-ordered.   [Docket #53].   Plaintiffs stipulate that this settlement agreement satisfied the wage claims presented in this action. Accordingly, because Plaintiffs consider these claims settled, Plaintiffs do not seek default judgment for the following claims contained in the Amended Complaint: Fair Labor Standards Act (Claim 1), Migrant and Seasonal Agricultural Worker Protection Act (Claim 2), Connecticut Wage and Hour Law (Claim 3), Breach of Contract (Claim 4), Breach of the Implied Covenant of Good Faith and Fair Dealing (Claim 5), and Unjust Enrichment and Quantum Meruit (Claim 6).   Claims relating to reckless and negligent supervision and contracting (Claims 12 and 13) were asserted only against the Imperial Defendants and consequently are not at issue here.[5]

Plaintiffs seek an entry of default judgment pursuant to the Pro Tree Defendants' liability for the following claims: the Guatemala Fraud (Claim 7), the Connecticut Fraud (Claim 8), Intentional Infliction of Emotional Distress (Claim 10), Negligent Infliction of Emotional Distress (Claim 11), Forced Labor, 18 U.S.C. § 1589 (Claim 14), Human Trafficking, 18 U.S.C. § 1590 (Claim 15), Involuntary Servitude and Forced Labor, Alien Tort Claims Act (Claim 16), Human Trafficking, Alien Tort Claims Act (Claim 17), Federal Racketeering Influenced Corrupt Organizations Act (Claim 19), and the Guatemala Labor Code (Claim 20).

## ARGUMENT

Following the Court's entry of default, Plaintiffs respectfully request that this Court enter judgments by default in the amounts specified in the attached motion.   Rule 55 "provides a two-step process for obtaining a default judgment.   The first step is to obtain a default. . . .   Having obtained a default, a plaintiff must next seek a judgment by default under Rule 55(b)." *New York*

---

[5] Plaintiff Carlos Aguilar voluntarily relinquishes his claim of False Imprisonment (Claim 9).   Further, Plaintiffs relinquish Claim 18, the Federal Racketeering Influenced Corrupt Organization Act claims that included the Imperial Defendants.

*v. Green*, 420 F.3d 99, 104 (2d Cir. 2005).  Plaintiffs will demonstrate that the well-pleaded allegations of the complaint satisfy the elements of each claim, and then provide a calculation of damages for each.

## I.  STANDARD FOR ENTRY OF 55(b) DEFAULT JUDGMENT.

Under a Rule 55(b) motion for default judgment, this Court should "accept[] as true all of the factual allegations of the complaint, except those relating to damages."  *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981).  Indeed, "a party's default is deemed to constitute a concession of all well pleaded allegations of liability."  *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).  *See also id.* at 158 ("It is, of course, ancient learning that a default judgment deems all the well-pleaded allegations in the pleadings to be admitted."); *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 108 (2d Cir. 1997) (same).  Accordingly, this Court should accept as true all allegations in the complaint for purposes of determining the Pro Tree Defendants' liability.

Once this Court concludes that a default judgment against the Pro Tree Defendants is proper, "[t]here is no question that a default judgment establishes liability."  *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995).  The only question that remains is the proper valuation of the damages to which Plaintiffs are entitled.   In this memorandum and accompanying exhibits, Plaintiffs provide evidence as to the appropriate damages that should be entered against the Pro Tree Defendants. *Greyhound Exhibitgroup*, 973 F.3d at 158.[6]

---

[6] Courts in the Second Circuit may, but need not, request evidentiary hearings to determine the appropriate damages for an entry of default judgment. *See, e.g., Greyhound Exhibitgroup*, 973 F.3d at 158.  Because Plaintiffs' written submissions establish both liability and appropriate damages, oral testimony is not necessary to entry of judgment in this case. *United States v. Borchers*, 163 F.2d 347, 349 (2d Cir. 1947).  *See also Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir. 1993) (hearing on damages not necessary).  This Court would be well within its discretion to grant the requested default judgment based on these papers. *Shah v. New York State Dep't of Civil Service*, 168 F.3d 610, 615 (2d Cir. 1999) (quoting *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993) ("The dispositions of motions for entries of defaults and default judgments . . . are left to the sound discretion of a district court because it

## II.  CLAIM-BY-CLAIM ANALYSIS.

In this Part, Plaintiffs analyze each claim in turn to demonstrate that the well-pleaded allegations of the Amended Complaint fulfill the legal standard for each claim.  Plaintiffs then provide evidence as to the valuations for each claim.  Finally, because some of these claims are alternative theories of liability for the same underlying conduct, Plaintiffs will provide a comprehensive accounting of damages sought in this matter, demonstrating that their proposed damage calculation does not double-count damages for the same injuries sustained by the Plaintiffs.

### A.  TVPA: Forced Labor In Violation Of Federal Law (18 U.S.C. § 1589) (Claim 14).

Congress passed the Victims of Trafficking and Violence Act of 2000 to criminalize forced labor, human trafficking, and related violations.  Pub. L. No. 106-386, 114 Stat. 1464 (2000).  When reauthorizing the Act in 2003, Congress created a private cause of action for victims of these crimes to further enhance enforcement of the TVPA.  Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 5, 117 Stat. 2875, 2878 (2003) (codified at 18 U.S.C. § 1595).  The civil enforcement provision states that victims of forced labor and human trafficking "may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees."  18 U.S.C. § 1595.  This civil remedy provides victims a direct opportunity to recover damages, increases the deterrent effect of the statute, and further punishes those who violate it.  *See* Krista Friedrich, *Statutes of Liberty?*, 72 Brooklyn L. Rev. 1139, 1151-52 (2007).  In this case, Plaintiffs seek damages under both Sections 1589 (forced labor) and 1590 (trafficking).

---

is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties.")).

**i.   Forced Labor Is a Violation of Federal Law for Which Defendants Are Civilly Liable.**

Section 1589 criminalizes conduct that amounts to forced labor.  To establish a violation of the statutory prohibition on forced labor, 18 U.S.C. § 1589, a plaintiff must show:

> (1) the defendant obtained the labor or services of another person; (2) the defendant did so by using either (a) threats of serious harm to, or physical restraint against, that person or any other person; or (b) a scheme, plan or pattern intended to cause the person to believe that non-performance would result in serious harm to, or physical restraint against, that person or any other person; and (3) the defendant acted knowingly.

*United States v. Marcus*, 487 F. Supp. 2d 289, 310 (E.D.N.Y. 2007).  As an alternative to showing (a) threats of serious harm or (b) a scheme or plan, plaintiffs may prevail by showing that defendants obtained the labor or services of another person "by means of the abuse or threatened abuse of law or the legal process."   18 U.S.C. § 1589(3).[7]

There is no requirement of showing physical harm to Plaintiffs; rather, courts have made plain that threatened abuse of the legal process is sufficient to state a section 1589 claim:

> The plain language of the TVPRA does not require a showing that Plaintiffs (or, in a criminal case, the victims) were actually harmed physically. It is enough to state a claim for a violation of the TVPRA if it is alleged that plaintiffs were forced to work by "threatened abuse of law or the legal process."

*Catalan v. Vermillion Ranch Ltd. Partnership*, No. 06-01043, 2007 WL 38135, at *9 (D. Colo. Jan. 4, 2007) (quoting 18 U.S.C. § 1589).

---

[7] Both sections 1589 and 1595 are recent, having been enacted in 2000 and 2003 respectively.  Accordingly, few cases provide guidance interpreting the substantive elements.  Nonetheless, Plaintiffs submit that criminal cases interpreting Section 1589 (as well as Section 1590) are fully relevant to the Court's inquiry.  Likewise, restitution awards may provide guidance in the valuation of appropriate damages.

Indeed, a recent note published in the November 2007 issue of the Columbia Law Review identifies only eighteen civil complaints invoking section 1595, including this action.  Jennifer S. Nam, *The Case of the Missing Case: Examining the Civil Right of Action for Human Trafficking Victims*, 107 Colum. L. Rev. 1655, 1670 (2007) (citing *Aguilar v. Imperial Nurseries* and seventeen other cases).  A search in Pacer of the remaining seventeen cases revealed no helpful precedent on the question of appropriate damages, since all claims were settled, dismissed, or remain pending.

13

### ii. The Pro Tree Defendants Committed Forced Labor in Violation of Federal Law.

In this case, it is undisputed that the Pro Tree Defendants knowingly "obtained the labor" of each Plaintiff.  Defendants Forero and Aranda also oversaw and directed Plaintiffs' work at Imperial Nurseries.  Am. Compl. ¶¶ 111, 113.  They dictated the conditions under which Plaintiffs would labor at Imperial Nurseries.  *Id.* ¶¶ 69-71.

Second, the Pro Tree Defendants obtained Plaintiffs' labor using unlawful means. Defendants psychologically and verbally abused Plaintiffs to coerce them into thinking that any refusal to continue working for Defendants "would result in serious harm" to them.  18 U.S.C. § 1589(2).   Defendants insulted Plaintiffs with racist epithets (referring to some Plaintiffs' indigenous ethnicity), M. Coto Aff. ¶ 34; L. Rodriguez Aff. ¶ 32, and called them "worthless" and "good-for-nothing" on numerous occasions.  Am. Compl. ¶¶ 147-48; A. Aguilar ¶ 34; M. Coto Aff. ¶ 34; W. Hernandez Aff. ¶ 44; A. Mendoza Aff. ¶ 66; L. Rodriguez Aff. ¶ 32.  When Plaintiffs suffered serious injuries or illnesses, Pro Tree Defendants denied them medical care and threatened to send them back to Guatemala without pay.  Am. Compl. ¶¶ 140-45; C. Aguilar Aff. ¶¶ 39-41, M. Coto ¶¶ 52-58; E. Espinoza Aff. ¶¶ 39-40; W. Hernandez Aff. ¶¶ 50-51;  A. Mendoza ¶¶ 71-73; H. Rodas Aff. ¶¶ 47-51; L. Rodriguez ¶ 35.   Defendants isolated and threatened to deport Plaintiffs who complained about the working conditions, punishing one complaining Plaintiff by confining him to his apartment for a day without pay, Am. Compl. ¶ 150; C. Aguilar Aff. ¶¶ 42-46, and sending another complaining Plaintiff to work in a separate field where he was forced to move a number of heavy carts alone.  Am. Compl. ¶ 151.  These threats and punishments were designed to psychologically intimidate the complaining Plaintiffs and the other Plaintiffs to ensure their continued labor for Defendants.  *Id.* ¶¶ 149-53.  *See United States v. Bradley*, 390 F.3d 145 (1st Cir. 2004), *vacated on other grounds*, 545 U.S. 1101

14

(2005) (stating that "section 1589 was intended expressly to counter *United States v. Kozminski*" by prohibiting psychological as well as physical forms of coercion); *Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 335 n.31 (D.N.J. 2005) (explaining that "[b]y reaching the intent to cause a particular subjective belief in the victim, section 1589 may be based on conduct that amounts to psychological coercion").

The Pro Tree Defendants also closely controlled and monitored the movements of Plaintiffs, causing Plaintiffs to believe they were physically restrained from leaving the employ of Defendants in violation of 18 U.S.C. § 1589(2).  Am. Compl. ¶¶ 91-106; A. Aguilar Aff. ¶¶ 50-51; C. Aguilar Aff. ¶¶ 50-54; M. Coto Aff. ¶ 43; E. Espinoza Aff. ¶¶ 43-50; W. Hernandez Aff. ¶¶ 33-36; A. Mendoza Aff. ¶¶ 52-55; H. Oreno Aff. ¶¶ 51-55; C. Pinto Aff. ¶¶ 45-50; H. Rodas Aff. ¶¶ 42-45; L. Rodriguez Aff. ¶¶ 44-45.   Defendants or their agents transported Plaintiffs between their apartments and the Imperial Nurseries worksite each day, and Defendants forbade Plaintiffs from leaving the apartments without Defendants' permission or supervision by one of their agents.  On Plaintiffs' one day off each week, an agent of Defendants accompanied Plaintiffs to the grocery store and laundromat to ensure that they did not escape.  Am. Compl. ¶ 96; *see also* A. Aguilar Aff. ¶ 51; C. Aguilar Aff. ¶ 53; M. Coto Aff. ¶ 43; E. Espinoza Aff. ¶ 46; W. Hernandez ¶ 36; A. Mendoza Aff. ¶ 54-55.

The Pro Tree Defendants obtained the labor of Plaintiffs by "the abuse or threatened abuse of law or the legal process," in violation of 18 U.S.C. § 1589(3).  Threats of "serious legal consequences, i.e., deportation for having violated the immigration laws of the United States" have been held to "clearly fall within the concept and definition of 'abuse of legal process.'" *United States v. Garcia*, No. 02-110S-01, 2003 U.S. Dist. LEXIS 22088, *23 (W.D.N.Y. Dec. 2, 2003) (describing threats of deportation directed toward Mexican field workers in New York

15

State as constituting "abuse of legal process"); *see also United States v. Kozminski*, 487 U.S. 931, 949 (1988) ("[I]t is possible that threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude.").

The Pro Tree Defendants routinely threatened Plaintiffs with the "serious legal consequence[]" of deportation.  Am. Compl. ¶¶ 95, 97, 101, 102-06, 146, 238; A. Aguilar Aff. ¶¶ 47-50; C. Aguilar Aff. ¶¶ 58-62; M. Coto Aff. ¶¶ 36-39; E. Espinoza Aff. ¶¶ 51-56; W. Hernandez Aff. ¶¶ 45-49; A. Mendoza Aff. ¶¶ 49-51; H. Oreno Aff. ¶¶ 51-52; C. Pinto Aff. ¶¶ 54-57; L. Rodriguez Aff. ¶¶ 43-46.   In addition to these specific and directed threats, Defendants confiscated Plaintiffs' passports on arrival, claiming that they were legally entitled to do so.  Am. Compl. ¶¶ 78-79, 84; A. Aguilar Aff. ¶¶ 24-28; C. Aguilar Aff. ¶¶ 29-32; M. Coto Aff. ¶¶ 23-26; E. Espinoza Aff. ¶¶ 26-28 W. Hernandez Aff. ¶¶ 26-29; A. Mendoza Aff. ¶¶  44-46; H. Oreno Aff. ¶¶ 26-29; C. Pinto Aff. ¶¶ 25-27; H. Rodas Aff. ¶¶ 32-35; L. Rodriguez Aff. ¶¶ 24-26. Defendants also falsely told Plaintiffs that their H-2B visas did not permit them to travel. Am. Compl. ¶¶ 98; A. Aguilar Aff. ¶ 52; C. Aguilar Aff. ¶ 58; M. Coto Aff. ¶ 44; E. Espinoza Aff. ¶ 44; A. Mendoza Aff. ¶ 54; H. Oreno Aff. ¶ 53; L. Rodriguez Aff. ¶ 45.  By thus abusing the legal process, Defendants sought to coerce Plaintiffs into continuing to labor for them.

Finally, the Pro Tree Defendants acted knowingly throughout this conduct.  Their actions were directly intended to coerce the Plaintiffs into working against their will.  *See* Am. Compl. ¶¶ 81-83.  Plaintiffs acted with specific intent out of a motive to maximize profit, with full knowledge of their actions.  *Id.*

In addition to satisfying the legal elements necessary to establish a forced labor claim under 18 U.S.C. § 1589, the Department of Homeland Security ("DHS") recognized Plaintiffs as victims of "a severe form of trafficking in persons" on August 15, 2007, when it granted the

16

eight Plaintiffs who had remained in the United States—Alexander Aguilar, Angel Mendoza, Carlos Aguilar, Esteban Espinoza, Hector Rodas Lopez, Hugo Oreno, Marvin Coto, and Walter Hernandez—Trafficking Visas, or "T-Visas" (copies of the eight T-Visa Approval Notices are attached as Exhibit M to the Hallett Decl.).[8]  In passing the TVPA in 2000, Congress sought to improve the services available to trafficking victims by authorizing the "continued presence" of victims of "a severe form of trafficking."  22 U.S.C. § 7105; *see also* 8 U.S.C. § 1101(a)(15)(T). In order to qualify for the nonimmigrant T-Visa, applicants must, among other requirements, demonstrate that they have been "a victim of a severe form of trafficking in persons," defined in relevant part as "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."  22 U.S.C. § 7102(8).  In granting the eight Plaintiffs' T-Visas, the Department of Homeland Security thus recognized that Defendants had subjected Plaintiffs to a severe form of trafficking under this definition by using illegal means to traffic them "for labor or services."

Because Plaintiffs have demonstrated that the Pro Tree Defendants subjected them to forced labor under 18 U.S.C. § 1589, Defendants should be held liable for their violation of the statute.

### iii.    Appropriate Damages for Federal Forced Labor Claim.

Section 1595 authorizes damages and reasonable attorneys' fees for violations of section 1589.  Plaintiffs are not aware of any cases resulting in court-awarded damages for section 1589 violations arising in civil suits.  Because there are no directly comparable judgments for purposes of evaluating damages, Plaintiffs submit that this Court should be guided by (1) restitution orders

---

[8] Because the other four Plaintiffs returned to Guatemala, they did not apply for T-Visas.  DHS approved all eight T-Visa applications filed by Plaintiffs.

provided to accompany section 1589 criminal convictions and (2) judgments awarded in analogous civil claims arising outside the section 1589 context.

The TVPA contains a mandatory restitution provision for criminal convictions under the statute. 18 U.S.C. § 1593 (providing that courts "shall order mandatory restitution" for "the full amount of the victim's losses"). But in providing such restitution under the TVPA, judgments often only take into account pecuniary damages relating to lost wages, thus greatly undercompensating victims for the non-economic harm suffered on account of forced labor. *See* Note, *Remedying the Injustices of Human Trafficking Through Tort Law*, 119 Harv. L. Rev. 2574, 2583-84 (2006) ("Restitution awards, which exclude damages for emotional and physical injuries as well as punitive damages, grossly understate the harms suffered by victims."). Moreover, as numerous commentators have observed, restitution awards in criminal prosecutions for forced labor are limited to losses suffered "as a proximate result of the offense" pursuant to section 1593, and are thus by statute more restricted than damages authorized in a civil suit for forced labor under section 1589, which allows damages for "the physical, emotional, and psychological pain and suffering endured by trafficking victims." Nam, *supra*, at 1666.

For example, in *United States v. Calimlim*, two defendants were convicted of violating section 1589 as well 8 U.S.C. § 1324(a), which criminalizes harboring unauthorized aliens. The defendants were found guilty of forcing their victim, a Filipino maid, to labor against her will for over nineteen years. The court ordered restitution of approximately $1 million. This award *solely* compensated the victim for her lost wages. *See United States v. Calimlim*, No. 03-0149, 2007 U.S. Dist. LEXIS 18933, at *3-4 (E.D. Wis. Feb. 14, 2007); *see also* Defendant Jefferson N. and Elnora Calimlim's Memorandum on Restitution and Forfeiture, *United States v. Calimlim*, at 1-2 (E.D. Wis. Dec. 4, 2006) (citing government contention that plaintiff labored for

18

nineteen years; government memorandum itself is sealed) (copy attached as Exhibit U to the Hallett Decl.).

Other analogous judgments, however, provide guidance as to appropriate damages in this case.  The current leading civil case on forced labor was brought prior to the enactment of Section 1595, but nonetheless is instructive as to the significant harm suffered by victims of such forced labor.  In *Ruiz v. Jackson*, a jury found that a Filipino woman was forced to labor for defendants as a maid for approximately one year, that defendants confiscated her passport, and that they paid her far below minimum wage.  *Ruiz v. Jackson*, No. SC076090 (Cal. Super. Ct. Aug. 27, 2004) (copy of summary from Nat'l Jury Verdict Review & Analysis database attached as Exhibit X to the Hallett Decl.).  The plaintiff brought claims pursuant to California statutes and tort law.  Ultimately, the plaintiff was awarded $1,375,000.  Because the plaintiff labored for approximately one year, this damage award is equivalent to approximately $3,760 for each day spent in conditions of forced labor.

In *Rogers v. Lawrence*, five crew members of a New England scalloper vessel were awarded $1,400,000, including $1,100,000 in punitive damages, for being forced to labor for the ship's captain under grueling conditions.  For a four- or five-day period on an eighteen-day voyage, the plaintiffs were forced to work twenty-four hours or more without food or rest until their scallop quotas were filled; subsequently they were confined to their quarters for seven or eight days and only permitted to leave to perform work on the vessel until they reached their destination.  For the approximately twelve-day period during which they forced to labor for the captain, each plaintiff thus received approximately $5,000 per day in compensatory damages and approximately $18,000 per day in punitive damages.  *Rogers v. Lawrence*, No. 84-1029W (D.

Mass. Dec. 6, 1985) (Nat'l Jury Verdict Review & Analysis) (attached as Exhibit W to Hallet Decl.).

Civil judgments regarding false imprisonment also present analogous claims to forced labor.  False imprisonment is "the unlawful restraint by one person of the physical liberty of another."  *Rivera v. Double A Transp., Inc.*, 248 Conn. 21, 31 (1999).  While subjected to forced labor, the Plaintiffs' liberty was unquestionably restrained.

Juries in Connecticut regularly award significant judgments in false imprisonment cases, even when the improper confinement only lasts a few hours.  In *Lucarelli v. Stop & Shop*, 1997 WL 293974 (Conn. Super. Ct. Feb. 1997) (Jury Verdicts Nat'l Database), a plaintiff was wrongfully detained by employees at a Stop & Shop supermarket and accused of stealing store property.  The jury awarded him damages of $10,000.  In another supermarket case, an employee detained a woman in the parking lot and brought her back into the store for allegedly stealing cheese.  Because the charge was spurious, the plaintiff was awarded damages of $50,000 for the temporary false imprisonment.  *Airone v. Stop & Shop*, No. 86-0243869, 1989 WL 989470 (Conn. Super. Ct. May 8, 1989).

In *Tyler v. Schnabel*, the plaintiff police officer was detained in the defendant police chief's office for approximately one hour in the course of an administrative investigation and subsequently subjected to numerous internal investigations.  The plaintiff sued the police chief alleging false imprisonment, intentional infliction of emotional distress, abuse of process, and section 1983 violations of his First and Fourteenth Amendment rights.  He was awarded $25,000 in compensatory and $10,000 in punitive damages on the false imprisonment claim alone, $100,000 in compensatory and $50,000 in punitive damages on the intentional infliction of emotional distress claim, and additional compensatory and punitive damages for each remaining

20

claim.  *Tyler v. Schnabel*, No. 88-0349210S, 1991 WL 1168204 (Conn. Super. Ct. Dec. 13, 1991) (Jury Verdicts Nat'l Database); *Schnabel v. Tyler*, 630 A.2d 1361 (Conn. App. 1993).

**Compensatory Damages.**  In light of these figures, Plaintiffs seek compensatory damages for injuries suffered of $3,000 per Plaintiff for each day he was subjected to the forced labor conditions.  As detailed in the calculation of damages below, Plaintiffs worked a total of 454 days under the forced labor conditions of the Pro Tree Defendants.  Therefore, Plaintiffs seek $1,362,000 in non-economic damages from the Pro Tree Defendants for the federal forced labor violations.

**Punitive Damages.**  Section 1595 employs the broad language of "damages," indicating that punitive damages are also available to victims who bring suit under the TVPA.  *See* Kelly E. Hyland, *Protecting Human Victims of Trafficking: An American Framework*, 16 Berkeley Women's L.J. 29, 51 ("Punitive damages are justified in civil trafficking cases because actual damages are grossly inadequate as a means of compensating victims for their traumatizing experiences and because they further financially disable traffickers."); Kathleen Kim & Kusia Hreshchyshyn, *Human Trafficking Private Right of Action: Civil Rights for Trafficked Persons in the United States*, 16 Hastings Women's L.J. 1, 16 (2004) ("Civil litigation, in contrast [to restitution in criminal cases], empowers trafficked persons individually to pursue greater damage awards in the form of compensatory, punitive, and/or pecuniary damages.  These damage awards can compensate victims for the physical and psychological injuries they have suffered, unlike limited restitution damages.").

Here, plaintiffs request a 2:1 ratio of punitive damages to compensatory damages, which is well within the bounds of any constitutional limitations.  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 424-35 (2003) (approving of single-digit ratio between compensatory

and punitive damages because "the Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish.").  Therefore, using this multiplier, Plaintiffs seek an additional total of $2,724,000 in punitive damages.

In total, Plaintiffs seek damages of $4,086,000 from the Pro Tree Defendants for violations of section 1589.[9]

### B.  TVPA: Human Trafficking In Violation of Federal Law (18 U.S.C. § 1590) (Claim 15).

In the TVPA, Congress separately prohibited human trafficking by penalizing one who "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter."  18 U.S.C. § 1590.  While forced labor relates to the conditions of labor that the Plaintiffs experienced in Connecticut, the trafficking element relates to their induced travel to Connecticut on account of the Pro Tree Defendants' fraudulent representations.  "The human trafficking counts are not multiplicitous of the involuntary servitude counts, as each requires proof of a fact the other does not."  *United States v. Maka*, 237 Fed. App'x 225, 227 (9th Cir. 2007).  Section 1595 also creates an express private right of action for violations of this provision.  18 U.S.C. § 1595.

#### i.  The Pro Tree Defendants Committed Human Trafficking in Violation of Federal Law.

To establish a violation of Section 1590, Plaintiffs must demonstrate that the Pro Tree Defendants (1) knowingly recruited, harbored, transported, provided, or obtained them by any means for (2) "labor or services in violation of this chapter."  18 U.S.C. § 1590.  As

---

[9] Plaintiffs note that they are entitled to attorneys' fees for TVPA pursuant to 18 U.S.C. § 1595.  Plaintiffs are also entitled to attorneys' fees for RICO and state law claims.  Plaintiffs' counsel have not submitted records of their costs or hours with this motion, and do not request entry of a judgment for attorneys' fees or costs at this time.  To avoid piecemeal fee petition filings, counsel will file a fee petition, if at all, only after the conclusion of all other proceedings before this Court.

22

demonstrated, the Pro Tree Defendants violated section 1589 by subjecting Plaintiffs to forced labor.  Because Defendants recruited and transported Plaintiffs in order to subject them to forced labor, the Pro Tree Defendants also violated section 1590.

It is apparent that Pro Tree Defendants knowingly recruited and transported Plaintiffs in order to subject them to forced labor in violation of 18 U.S.C. § 1590.  Am. Compl. ¶ 297-98.  Defendants recruited Plaintiffs in Guatemala City, promising them work planting pine trees in North Carolina at a wage of $7.50 per hour.  *Id.* ¶¶ 39-41, 47-48; A. Aguilar Aff. ¶ 8; C. Aguilar Aff. ¶ 7; M. Coto Aff. ¶ 6; E. Espinoza Aff. ¶ 5; W. Hernandez Aff. ¶ 5; A. Mendoza Aff. ¶ 7; H. Oreno Aff. ¶ 8; C. Pinto Aff. ¶ 6; H. Rodas Aff. ¶ 7; L. Rodriguez Aff. ¶ 6.  When the first set of Plaintiffs arrived in the United States in March, however, they were instead transported from North Carolina across state lines to Connecticut, without their consent, by an agent of Defendant Pro Tree.  Am. Compl. ¶¶ 50-58; C. Aguilar Aff. ¶¶ 12-21; M. Coto Aff. ¶¶ 10-16; E. Espinoza Aff. ¶¶ 13-19; W. Hernandez Aff. ¶¶ 11-17; A. Mendoza Aff. ¶¶ 25-33; C. Pinto Aff. ¶¶ 14-21; H. Rodas Aff. ¶¶ 13-21; L. Rodriguez Aff. ¶¶ 14-20.  Likewise, when the second set of Plaintiffs arrived in the United States in April, they flew to Hartford, Connecticut, instead of being taken to a worksite in North Carolina.  Am. Compl. ¶¶ 65-68; A. Aguilar Aff. ¶¶ 14-15; H. Oreno Aff. ¶¶ 18-20.  In Hartford they were met by Defendant Forero, who ordered them to appear at the Imperial Nurseries worksite the next day.  Am. Compl. ¶¶ 65-68.

The Pro Tree Defendants sought to recruit and transport the March Plaintiffs and the April Plaintiffs for the purpose of committing forced labor.  Although the Pro Tree Defendants had offered Plaintiffs jobs planting pine trees in North Carolina at an hourly rate, their actual objective was to force Plaintiffs to work at Imperial Nurseries for negligible pay, under grueling

conditions, and to do so through psychologically coercive and illegal means.  Am. Compl. ¶¶ 39-41, 47-48, 88, 91-106, 127-29, 131-32, 134, 136, 139-53, 238.

The Pro Tree Defendants also knowingly harbored Plaintiffs for the purpose of committing forced labor.  The Pro Tree Defendants ordered Plaintiffs to stay in two filthy apartments that lacked basic necessities like furniture, food, and cleaning supplies.  *Id.* ¶¶ 50-62, 68; A. Aguilar Aff. ¶ 20; M. Coto Aff. ¶¶ 17-18; E. Espinoza Aff. ¶ 22; W. Hernandez Aff. ¶ 18; A. Mendoza Aff. ¶ 36; H. Oreno Aff. ¶ 23; C. Pinto Aff. ¶ 22; H. Rodas Aff. ¶¶ 23-24; L. Rodriguez Aff. ¶ 20.  Defendants' provision of housing for Plaintiffs enabled them to maintain control over them, thus helping to effectuate Defendants' aim of forcing Plaintiffs to labor for them.  Am. Compl. ¶¶ 59, 64, 68, 91-96.  The appalling conditions of the apartment and the dangerous nature of the surrounding neighborhood also contributed to Defendants' ability to coerce Plaintiffs into continuing to labor for them.  *Id.* ¶¶ 60-63, 95; A. Aguilar Aff. ¶ 51; C. Aguilar Aff. ¶ 57; E. Espinoza Aff. ¶ 45; W. Hernandez Aff. ¶ 34; H. Oreno Aff. ¶ 52; C. Pinto Aff. ¶ 49; L. Rodriguez Aff. ¶ 44.

Because Defendants knowingly recruited, transported, and harbored Plaintiffs in order to commit forced labor in violation of section 1589, Defendants should be held liable for trafficking them for that illicit purpose in violation of 18 U.S.C. § 1590.

### ii.  Appropriate Damages for Federal Human Trafficking Claims.

Plaintiffs are entitled to compensatory and punitive damages for Defendants' knowing violation of the federal anti-human trafficking statute, 18 U.S.C. § 1590.  As with section 1589, Plaintiffs are not aware of any civil judgments awarding damages in cases involving Section 1590—or, for that matter, *any* human trafficking claims.  Accordingly, Plaintiffs submit evidence of analogous tort claims in support of their requested relief.

Kidnapping under Connecticut law is defined as the abduction of another person where the perpetrator's intent "is to compel a third person . . . to engage in other particular conduct or to refrain from engaging in particular conduct" or where the perpetrator "restrains the person abducted with intent to . . . accomplish or advance the commission of a felony."  Conn. Gen. Stat. § 53-92a (2007).  Defendants' conduct—including recruiting, transporting, and harboring the Plaintiffs—was clearly intended to "compel" Plaintiffs to engaged in forced labor.  Likewise, Defendants' psychological coercion, control of Plaintiffs' movements, and abuse of the legal process had the effect of "restrain[ing]" Plaintiffs from leaving Defendants' employ.

The Pro Tree Defendants' trafficking activity is also analogous to the federal kidnapping statute, which defines a kidnapper as one who "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when . . . the person is willfully transported in interstate or foreign commerce."  18 U.S.C. § 1201(a).  Pro Tree Defendants "inveigled" or deceived Plaintiffs to cause them to come to the United States by falsely telling them they would receive $7.50 an hour planting pine trees in North Carolina, then transported them across state lines to Connecticut.  Like human trafficking, kidnapping involves the coerced physical movement or transportation of a person from one place to another, in contrast with false imprisonment and forced labor, where an individually is generally confined to a certain location.

Juries have recognized the egregious nature of kidnapping in damage awards.  In one typical negligent security case involving a hotel guest kidnapped from the hotel's parking lot, beaten, and forced to withdraw $300 from an automatic teller machine, the jury awarded the victim $620,000 for his forty-five minute ordeal.  Claiming only non-physical, psychological injuries, the plaintiff received $10,000 for past medical and related expenses, $10,000 for future

medical and related expenses, $200,000 for past pain and suffering, $200,000 for future pain and suffering, and his wife received $200,000 for loss of consortium.  *Uva v. Marriott Hotels, Inc.*, No. 93-776-CI-15, 1995 WL 807024 (Fl. Cir. Ct. Aug. 24, 1995) (Jury Verdict Nat'l Database).  *See also Chance v. AMLI/BPMT Breckenridge P'ship*, No. 05-00464, 2007 WL 755404 (E.D. Tex. Jan. 16, 2007) (awarding woman who sued her apartment complex owners for negligent security—after she was kidnapped from her apartment and sexually assaulted by her ex-husband—$950,000, including $550,000.00 for past physical pain and mental anguish, $250,000.00 for future physical pain and mental anguish, and $150,000 for future medical expenses); *Doe v. K-Mart Corp.*, No. 95-CP-10-2590, 1997 WL 744394 (S.C. Com. Pl. Oct. 9, 1997) (Jury Verdict Nat'l Database) (awarding woman kidnapped from parking lot of store and sexually assaulted twice in twenty-hour period $600,000 based on store's negligent security).

In this case, after being misled by recruiters in Guatemala, Plaintiffs were trafficked to Connecticut.  The Pro Tree Defendants compelled the Plaintiffs to cross international borders in order to subject them to forced labor.  Because of the disorientation of this travel, Plaintiffs were in an especially compromising position of vulnerability, unaware of their legal rights, unable to freely travel, and in constant fear of deportation as a result of Defendants' consistent threats.  Human trafficking is an egregious crime similar in character and severity to kidnapping. See, e.g., Department of State, Victims of Trafficking and Violence Protection Act of 2000: Trafficking in Persons Report: June 2005, available at http://www.state.gov/documents/organization/47255.pdf ("Human traffickers today use kidnapping, fraud, psychological abuse and beatings to force men, women and children into labor and sex exploitation."); Department of State, Trafficking in Persons Report: June 2007,

available at http://www.state.gov/documents/organization/82902.pdf (calling human trafficking a "repulsive crime").

**Compensatory damages.**  Recognizing the high value juries have awarded plaintiffs in analogous cases of kidnapping as well as the heinous nature of the trafficking offense, Plaintiffs therefore seek $100,000 each in compensatory damages.  For violations of the federal anti-trafficking statute, this totals $1,200,000 compensatory damages for all Plaintiffs.

**Punitive Damages.**  Section 1595 also provides for punitive damages for claims brought under section 1590.  As with forced labor, plaintiffs seek a 2:1 ratio of punitive to compensatory damages.  As such, Plaintiffs request a total of $2,400,000 in punitive damages.

In total, Plaintiffs seek damages of $3,600,000 for Pro Tree Defendants' violations of section 1590.[10]

### C.  Alien Tort Claims Act: Involuntary Servitude And Forced Labor In Violation Of International Law (28 U.S.C. § 1350) (Claim 16).

Human trafficking and forced labor not only violate domestic law, but they are also prohibited by fundamental norms of international law.  And those who violate these international norms may be held civilly liable in U.S. courts.  Accordingly, this Court should also enter a default judgment against the Pro Tree Defendants for violations of international law.

The Alien Tort Claims Act ("ATCA") creates jurisdiction for aliens who assert limited torts in violation of international law:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350.  In *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004), the Supreme Court held that certain violations of international are actionable in U.S. courts as violations of federal

---

[10] Plaintiffs reserve the right to bring a claim for attorneys' fees pursuant to Section 1595 for the human trafficking claim following the conclusion of litigation in this Court.

common law.  International norms that are "definable, universal, and obligatory," according to *Sosa*, are actionable under ATCA.  *Id.* at 732 (quoting *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 (D.C. Cir. 1984) (Edwards, J., concurring)); *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994)).  The prohibition of involuntary servitude and forced labor is precisely such a norm that supports a private cause of action under these *Sosa* standards.

### i.  The International Norm Prohibiting Involuntary Servitude and Forced Labor Is Actionable Under ATCA.

Courts have routinely held that because "forced labor . . . is prohibited under the law of nations," violations of this norm support a cause of action under ATCA.  *Doe v. Reddy*, No. 02-5570, 2003 WL 23893010, at *9 (N.D. Cal. Aug. 4, 2003).  *See also Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 441 (D.N.J. 1999) ("[T]he case law and statements of the Nuremberg Tribunals unequivocally establish that forced labor violates customary international law.").[11]

The prohibition on forced labor is well established in international law, having been codified since at least since 1930.  The 1930 ILO Forced Labour Convention bans forced or compulsory labor, which it defines as "all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily."  ILO Forced Labour Convention (No. 29), June 28, 1930, 39 U.N.T.S. 55.  This convention was reaffirmed and extended by the ILO Abolition of Forced Labour Convention (No. 105), June 26, 1957, 320 U.N.T.S. 291.  Numerous other treaties have similarly recognized that the international prohibition on forced labor is a fundamental norm of international law.  *See, e.g.*, International Covenant on Civil and Political Rights, art. 8(3), Dec. 16, 1966, 993 U.N.T.S. 171 ("No one shall be required to perform forced or compulsory labour.");

---

[11] A panel of the Ninth Circuit also has expressly held that the norm prohibiting forced labor is actionable under ATCA.  *Doe I v. Unocal Corp.*, 395 F.3d 932, 947 (9th Cir. 2002), *vacated by grant of rehearing en banc*, 395 F.3d 978 (2003), *appeal dismissed*, 403 F.3d 708 (2005).  Because the case settled, the panel opinion of the Ninth Circuit was vacated without a superseding opinion.

International Covenant on Economic, Social and Cultural Rights, art. 6, Dec. 16, 1966, 993 U.N.T.S. 3; American Convention on Human Rights, art. 6, Nov. 12, 1969, 1114 U.N.T.S. 123 ("No one shall be required to perform forced or compulsory labor.").[12]

Further, involuntary servitude and forced labor may be committed by private actors; there is no requirement that state actors be involved in the commission of the offense.  The Second Circuit has resolved that "[i]ndividuals may be held liable for offenses against international law, such as piracy, war crimes, and genocide." *Kadic v. Karadic*, 70 F.3d 232, 240 (2d Cir. 1995) (citing Restatement (Third) of Foreign Relations Law of the United States, at pt. ii intro. note (1986)).  In so doing, the Second Circuit held that violations of the international norm prohibiting the slave trade were applicable to private parties.  *Id*.  Courts have extended this holding in *Kadic* to forced labor claims which are substantively similar to violations of slave trading.  *See, e.g.*, *Estate of Rodriquez v. Drummond Co., Inc.*, 256 F. Supp. 2d 1250, 1260 (N.D. Ala. 2003) (citing *Kadic*, 70 F.3d at 239) ("[C]ourts interpreting the ATCA have found that certain forms of conduct—piracy, the slave trade, slavery and forced labor, aircraft hijacking, genocide, and war crimes—violate the law of nations 'whether undertaken by those acting under the auspices of a state or only as private individuals.'"); *Iwanowa*, 67 F. Supp. 2d at 445 (finding that private actors are liable under ATCA for forced labor violations because "[n]o logical reason exists for allowing private individuals and corporations to escape liability for universally condemned violations of international law merely because they were not acting under color of law.").[13]  These conclusions are supported by international agreements which make clear that the prohibition on forced labor extends to private organizations.  *See* ILO Forced Labour Convention

---

[12] The Nuremburg Tribunals also held that forced labor violated international law.  *Iwanowa*, 67 F. Supp. 2d at 440 (citing R. Jackson, *The Nuremberg Case* xiv-xv (1971)).

[13] The Ninth Circuit in *Unocal* concurred in this conclusion: "forced labor is a modern variant of slavery that, like traditional variants of slave trading, does not require state action to give rise to liability under the ATCA." *Unocal Corp.*, 395 F.3d at 947 (9th Cir. 2002), *vacated by grant of rehearing en banc*, 395 F.3d 978 (2003).

art. 4(1) (stating that a state signatory "shall not impose or permit the imposition of forced or compulsory labour for the benefit of private individuals, companies or associations.").

### ii. The Pro Tree Defendants Committed Involuntary Servitude and Forced Labor in Violation of International Law.

The Pro Tree Defendants forced Plaintiffs to work against their will, and thereby committed forced labor in violation of international law.  The leading international instrument defines forces labor as "all work or service which is exacted from any person under the menace of any penalty and for which the said person has not offered himself voluntarily."  ILO Forced Labour Convention (No. 29) art. 2.

The Plaintiffs, who thought they would be planting pine trees in North Carolina, never freely offered themselves to work at Imperial Nurseries in Connecticut.  Am. Compl. ¶¶ 41, 305; A. Aguilar Aff. ¶ 8; C. Aguilar Aff. ¶ 7; M. Coto Aff. ¶ 6; E. Espinoza Aff. ¶ 5; W. Hernandez Aff. ¶ 5; A. Mendoza Aff. ¶ 7; H. Oreno Aff. ¶ 8; C. Pinto Aff. ¶ 6; H. Rodas Aff. ¶ 7; L. Rodriguez Aff. ¶ 6.  Further, once the Plaintiffs began work, the Pro Tree Defendants engaged in a pattern of behavior to ensure that Plaintiffs felt they were not free to leave.  This activity included retaining Plaintiffs' passports so that would not be free to leave, Am. Compl. ¶¶ 78-86; A. Aguilar Aff. ¶¶ 24-28; C. Aguilar Aff. ¶¶ 29-32; M. Coto Aff. ¶¶ 23-26; E. Espinoza Aff. ¶¶ 26-28 W. Hernandez Aff. ¶¶ 26-29; A. Mendoza Aff. ¶¶  44-46; H. Oreno Aff. ¶¶ 26-29; C. Pinto Aff. ¶¶ 25-27; H. Rodas Aff. ¶¶ 32-35; L. Rodriguez Aff. ¶¶ 24-26, constantly threatening Plaintiffs with threats of arrest and/or deportation should they flee or stop working, Am. Compl. ¶¶ 88; 102; 139-142; 146-149; 152, A. Aguilar Aff. ¶¶ 47-50; C. Aguilar Aff. ¶¶ 58-62; M. Coto Aff. ¶¶ 36-39; E. Espinoza Aff. ¶¶ 51-56; W. Hernandez Aff. ¶¶ 45-49; A. Mendoza Aff. ¶¶ 49-51; H. Oreno Aff. ¶¶ 51-52; C. Pinto Aff. ¶¶ 54-57; L. Rodriguez Aff. ¶¶ 43-46, and psychologically manipulating Plaintiffs' fears relating to their debt and inability to repay should

30

they be arrested and/or deported, Am. Compl. ¶¶ 44-45; 48; 138; A. Aguilar Aff. ¶ 59; C. Aguilar Aff. ¶ 63; A. Mendoza Aff. ¶ 62; L. Rodriguez Aff. ¶¶ 48-49.

### iii. Appropriate Damages for ATCA Involuntary Servitude and Forced Labor Violations.

In forced labor cases, significant damages are appropriate. As discussed, *supra* at Section II.A., Plaintiffs have identified two state cases in which victims of forced labor violations were awarded approximately $3,760 and $5,000 in compensatory damages, respectively, for each day spent in conditions of forced labor. Here, Plaintiffs believe that the damages appropriate for violations of forced labor under international law are appropriately parallel to the damages available for violations of the federal forced labor statute, 28 U.S.C. § 1589. As stated, Plaintiffs seek an award of $3,000 for each day spent in forced labor as a measure of non-economic damages, for a total award of $1,362,000 in compensatory damages for forced labor.

In addition to non-economic injuries, Plaintiffs also seek punitive damages which are available for alien tort claims. For example, in *Arce v. Garcia*, 434 F.3d 1254, 1256 (11th Cir. 2006), in affirming on other grounds, the Eleventh Circuit noted that compensatory and punitive damages for torture brought in part through an ATCA claim totaled $54,600,000 for three plaintiffs. Plaintiff Juan Romagoza Arce received judgment in the amount of $5,000,000 for damages, and then $15,000,000 in punitive damages (copy of Judgment, Romagoza v. Garcia, No. 99-8364 (S.D. Fla. Jul. 23, 2002) attached as Exhibit V to Hallett Decl.). *See also Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1265 (11th Cir. 2005) (noting that plaintiffs were entitled to punitive damages on ATCA claim); *Abebe-Jira v. Negewo*, 72 F.3d 844, 846 (11th Cir. 2003) (affirming ATCA award of $200,000 in compensatory damages and $300,000 in punitive damages to each plaintiff); *Chavez v. Carranza*, No. 03-2932, 2006 WL

2434934, at *2 (W.D. Tenn. Aug. 15, 2006) (noting that jury awarded each plaintiff $500,000 in compensatory damages and $1,000,000 in punitive damages).

Again, the Plaintiffs seek a 2:1 ratio of punitive damages to compensable damages. Therefore, the Plaintiffs request $2,724,000 in punitive damages, and a total of $4,086,000 for both compensatory and punitive damages.

### D.   Alien Tort Claims Act: Human Trafficking in Violation of International Law (28 U.S.C. § 1350) (Claim 17).

Like involuntary servitude and forced labor, human trafficking is also a violation of international law.  Every court that has considered the issue has held that human trafficking is a tort in violation of international law that is actionable under the jurisdictional grant of the ATCA. The Pro Tree Defendants trafficked the Plaintiffs in violation of this international norm. Accordingly, significant damages against these Defendants are appropriate.

### i.   The International Norm Prohibiting Human Trafficking Is Actionable Under the ATCA.

Courts have consistently concluded that the international norm which precludes human trafficking is sufficiently well established to support a cause of action brought through ATCA. For example, in *Doe v. Reddy*, No. 02-5570, 2003 WL 23893010, at *9 (N.D. Cal. Aug. 4, 2003), the court concluded that claims alleging human trafficking in violation of international law, along with claims of forced labor, were actionable under the ATCA.  Similarly, in *Topo v. Dhir*, No. 01-10881, 2003 U.S. Dist. LEXIS 21937, at *12-14 (S.D.N.Y. Dec. 3, 2003), the court concluded that human trafficking was actionable under ATCA.

This conclusion is entirely consistent with the *Sosa* standards: the international norm prohibiting human trafficking is specific, universal, and obligatory.  *Sosa v. Alvarez-Machain*, 542 U.S. at 732.  The international norm prohibiting human trafficking is plainly defined by

international treaties.  For example, the U.N. Protocol on Trafficking defines human trafficking as:

> [T]he recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation.

Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Crime art. 3(a), Nov. 15, 2003, 55 U.N. GAOR Supp. (No. 49) at 60, 40 I.L.M. 335 (the "Protocol on Trafficking").  Under the treaty, "exploitation" includes "forced labour or services."  *Id*.  This protocol currently has 117 signatories, demonstrating the universality of the norm.  *See* Signatories to the CTOC Trafficking Protocol, http://www.unodc.org/unodc/en/treaties/CTOC/ countrylist-traffickingprotocol.html (2008).  Although the Protocol on Trafficking is a recent development in international law, it is merely a further codification of longstanding customary international law and international treaties.  Indeed, various instruments have declared human trafficking a violation of international law for over a hundred years.[14]

The prohibition on human trafficking has its roots in a longstanding norm of international law: the prohibition on slave trading.  Slave trading has long been recognized as a violation of international law actionable under the ATCA.  *See, e.g.*, *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir. 1980) (holding that "for purposes of civil liability, the torturer has become—like the pirate and slave trader before him—*hostis humani generis*, an enemy of all mankind.").  And

---

[14] The international prohibition on human trafficking initially developed in the context of sex trafficking.  In 1904, the international community adopted the International Agreement for the Suppression of the "White Slave Traffic," May 18, 1904, 35 Stat. 1979, 1 L.N.T.S. 83, to prohibit the sex trafficking of women.  The subsequent international agreement, the International Convention for the Suppression of the "White Slave Traffic," Art. 1.  May 4, 1910, 211 Consol. T.S. 45, 103 B.F.S.P. 244, sought criminal penalties for such trafficking.  Condemnation of human trafficking for prostitution was further condemned in the Convention for the Suppression of the Traffic in Persons and of the Exploitation of the Prostitution of Others, art. 1., Dec. 2, 1949, 96 U.N.T.S. 271.

human trafficking in turn is widely regarded as a modern-day manifestation of slavery: "Congress recognized that human trafficking . . . 'is a modern form of slavery, and it is the largest manifestation of slavery today.'" *United States v. Evans*, 476 F.3d 1176, 1179 (11th Cir. 2007) (citing 22 U.S.C. § 7101(b)(1)). *See also* Department of State, *Trafficking in Persons Report: June 2007*, at 3, available at http://www.state.gov/documents/organization/82902.pdf (statement of Secretary Rice) ("Trafficking in persons is a modern-day form of slavery.").

### ii. The Pro Tree Defendants Committed Human Trafficking in Violation of International Law.

*Topo* interprets the Protocol on Trafficking to hold that three elements must be present for an ATCA defendant to be liable for human trafficking: "To establish a civil claim for trafficking under international law, [a plaintiff] must show that she was: (1) recruited, transported, transferred or harbored by the [defendants], (2) by means of force, coercion, abduction, fraud, deception, abuse of power, or by payment to a person controlling her, (3) for the purpose of exploitation such as forced labor or servitude." *Topo*, 2003 U.S. Dist. LEXIS 21937, at *12-13 (citing Protocol on Trafficking, art. 3(a)).

The elements defining human trafficking identified by *Topo* and the Protocol on Trafficking are all present here.  First, the Pro Tree Defendants recruited the Plaintiffs in Guatemala.  Am. Compl. ¶¶ 39-49; A. Aguilar Aff. ¶¶ 7-13; C. Aguilar Aff. ¶¶ 4-10; M. Coto Aff. ¶¶ 4-8; E. Espinoza Aff. ¶¶ 4-9; W. Hernandez Aff. ¶¶ 4-9; A. Mendoza Aff. ¶¶ 4-17; H. Oreno Aff. ¶¶ 4-17; C. Pinto Aff. ¶¶ 4-10; H. Rodas Aff. ¶¶ 7-10; L. Rodriguez Aff. ¶¶ 5-10. The Pro Tree Defendants caused the transportation of Plaintiffs to Connecticut. Am. Compl. ¶¶ 39-49; C. Aguilar Aff. ¶ 12-21; M. Coto Aff. ¶ 10-16; E. Espinoza Aff. ¶¶ 13-19; W. Hernandez Aff. ¶¶ 11-17; A. Mendoza Aff. ¶¶ 25-33; C. Pinto Aff. ¶¶ 14-21; H. Rodas Aff. ¶¶ 13-21; L. Rodriguez Aff. ¶¶ 14-20.  The March Plaintiffs were placed in a van and driven many hours to

an unnamed destination by an agent of the Pro Tree Defendants. Am. Compl. ¶¶ 50-59.
Likewise, the Pro Tree Defendants harbored the Plaintiffs by placing them in apartments and
restricting their freedom of movement. *Id*. at ¶¶ 59-60, 68; A. Aguilar Aff. ¶¶ 50-51; C. Aguilar
Aff. ¶¶ 50-54; M. Coto Aff. ¶ 43; E. Espinoza Aff. ¶¶ 43-50; W. Hernandez Aff. ¶¶ 33-36; A.
Mendoza Aff. ¶¶ 52-55; H. Oreno Aff. ¶¶ 51-55; C. Pinto Aff. ¶¶ 45-50; H. Rodas Aff. ¶¶ 42-45;
L. Rodriguez Aff. ¶¶ 44-45.

Second, the Pro Tree Defendants employed coercion, fraud, deception, and abuse of
power and the legal process in order to engage in trafficking.   The Pro Tree Defendants
defrauded Plaintiffs by falsely representing the labor they would be performing.  Am. Compl. ¶¶
229-32.   These Defendants continued this fraudulent scheme by representing to Plaintiffs that
they would be arrested and/or deported if they failed to work and follow orders.  Am. Compl. ¶¶
238-41; A. Aguilar Aff. ¶¶ 47-50; C. Aguilar Aff. ¶¶ 58-62; M. Coto Aff. ¶¶ 36-39; E. Espinoza
Aff. ¶¶ 51-56; W. Hernandez Aff. ¶¶ 45-49; A. Mendoza Aff. ¶¶ 49-51; H. Oreno Aff. ¶¶ 51-52;
C. Pinto Aff. ¶¶ 54-57; L. Rodriguez Aff. ¶¶ 43-46.

Third, the Pro Tree Defendants recruited, transported, transferred, and harbored the
Plaintiffs in order to commit forced labor.  Am. Compl. ¶¶ 289-92, 303-05. Because Plaintiffs'
travel was induced on account of false and fraudulent representations, and the Pro Tree
Defendants intended to subject Plaintiffs to forced labor, the Pro Tree Defendants committed
human trafficking in violation of international law.  As federal common law provides a cause of
action for international torts, and the Alien Tort Claims Act creates jurisdiction for this Court to
hear the claim, the Pro Tree Defendants should be found civilly liable for these activities.

### iii.  Appropriate Damages for ATCA Human Trafficking Violations.

Plaintiffs also seek damages for the Pro Tree Defendants' violation of the international norm prohibiting human trafficking, parallel to those sought under section 1590 of federal law. Although human trafficking is related to forced labor, the conduct is separate and seeking damages for the separate conduct is appropriate.  The Plaintiffs each suffered human trafficking when they were brought into the country under fraudulent premises for the purposes of entering forced labor; they suffered forced labor each day that they were compelled to work under threats of arrest and/or deportation.

Each Plaintiff again seeks $100,000 in compensatory damages for the occurrence of human trafficking.  For the twelve Plaintiffs, this totals $1,200,000.  Plaintiffs here also request a two to one ratio of punitive damages, a total of $2,400,000 in punitive damages on this claim. As such, Plaintiffs request total damages of $3,600,000 for the Pro Tree Defendants' violation of international law regarding human trafficking.

### E.  Federal RICO (Pro Tree as the Enterprise) (Claim 19).

In Claim 19, Plaintiffs alleged that the Pro Tree Defendants violated the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*[15]  To prevail on a civil action brought under RICO, a plaintiff must have suffered an injury arising from a substantive violation of 18 U.S.C. § 1962.  Plaintiffs demonstrate that the Pro Tree Defendants satisfied the elements of a federal RICO claim, that they committed sufficient predicate acts, and that they are liable for significant damages.

### i.  The Pro Tree Defendants' Activities Satisfy All Elements of the Civil RICO Offense.

Plaintiffs allege that Defendants Forero and Aranda violated 18 U.S.C. § 1962(c) and that

---

[15] Plaintiffs have relinquished Claim 18 of the Am. Compl., which alleged alternative RICO claims, pursuant to the stipulation and settlement with the Imperial Defendants.

they suffered an injury as a result of this violation.  To establish a violation of 18 U.S.C. § 1962(c), a plaintiff must show the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985); *see also Anatian v. Coutts Bank (Switz.) Ltd.*, 193 F.3d 85, 89 (2d Cir. 1999).  Plaintiffs have established each of these elements.

First, Plaintiffs have shown that Pro Tree Forestry Services ("Pro Tree") meets the definition of an enterprise.  18 U.S.C. § 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  Legal status as a corporation, while not necessary, is sufficient to establish a RICO enterprise.  *United States v. Turkette*, 452 U.S. 576, 583 (1981) (identifying two categories of RICO enterprise: "legal entities" such as "corporations and partnerships," and "group[s] of persons associated together for a common purpose of engaging in a course of conduct").  Pro Tree is a limited liability corporation organized under the laws of the State of North Carolina that has operated continuously since September 19, 2000.  *See* North Carolina Secretary of State Corporate Filings: Pro Tree Forestry Services ("Corporate Filings"), attached as Exhibit R to Hallett Decl.  Therefore, Pro Tree constitutes a "legal entity" and therefore an enterprise under 18 U.S.C. § 1961(4).

Plaintiffs have also established that Defendants Forero and Aranda are persons "employed by or associated with" Pro Tree who "conduct[ed] or participat[ed] . . . in the conduct of [Pro Tree's] affairs."  U.S.C. § 1962(c); *see also Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (plaintiff must show "that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs.").[16]  Both Defendants are clearly "employed by

---

[16] Because RICO, 18 U.S.C. § 1961 et seq., punishes the actions of persons who conduct the enterprise and not the

or associated with" Pro Tree Forestry Services. Defendant Forero is the owner, operator, and manager of Pro Tree.  Am. Compl. ¶ 6; *see also* Corporate Filings.  Defendant Aranda was an agent and employee of Pro Tree during the time period in which the racketeering injuries occurred.  *Id.* at ¶ 7; *see also* A. Aguilar Aff. ¶ 23-27, 34, 42, 58; C. Aguilar Aff. ¶ 23-30, 33, 46-49; M. Coto Aff. ¶¶ 16,-17, 23-24, 34-36.

Furthermore, at all times relevant to this action, Defendants Forero and Aranda conducted or participated in the conduct of Pro Tree's affairs. Through their fraudulent representations to plaintiffs, Am. Compl. ¶¶ 39-49, their unlawful transportation of plaintiffs from North Carolina to Connecticut, *id.* ¶¶ 50-68, their confiscation of Plaintiffs' passports, *id.* ¶¶ 78-90, their supervision of plaintiffs in the Imperial fields, *id.* ¶¶ 107-11, their mistreatment and verbal abuse of plaintiffs, *id.* ¶¶ 146-51, their refusal to pay plaintiffs adequate wages, *id.* ¶¶ 126-38, their threats of deportation and arrest directed towards Plaintiffs, *id.* ¶¶ 151-55, and their denial of Plaintiffs' requests for medical attention, *id.* at ¶¶ 139-45, Defendants Forero and Aranda acted at all times as agents of Pro Tree and never in their individual capacities.  Plaintiffs have therefore established the "conduct of an enterprise" as required under 18 U.S.C. § 1962(c).

Plaintiffs have likewise established that the Pro Tree Defendants conducted the enterprise "through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  A pattern of racketeering activity requires the commission of at least two predicate acts, defined to include twenty-seven federal crimes and eight state crimes, the last of which has occurred within ten years. 18 U.S.C. § 1961(5).  Defendant Forero committed multiple predicate acts of visa fraud in violation of 18

---

enterprise itself, "one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise'. . . ." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).  An individual and a legal entity of which that individual is apart, however, are considered separate entities for the purposes of 18 U.S.C. § 1962.  Therefore, a small business—even if it does not have any employees—constitutes an enterprise distinct from the owner. *Id.* at 163.

U.S.C. § 1546.  Defendant Forero committed at least one act of mail fraud in violation of 18 U.S.C. § 1341.  Finally, Defendants Forero and Aranda committed multiple predicate acts of human trafficking and forced labor in violation of 18 U.S.C. §§ 1589 & 1590.  Defendants committed several of these predicate acts as recently as June 2006.  Accordingly, Forero and Aranda are liable for civil violations of RICO.

### ii.  The Pro Tree Defendants Committed Sufficient Predicate Acts to Violate RICO.

Defendant Forero committed at lease twelve acts of visa fraud in violation of 18 U.S.C. § 1546(a), which proscribes two different courses of conduct concerning visa applications: (1) making a false statement under oath or otherwise subject to the penalty of perjury and (2) presenting a false statement, whether or not under oath or subject to penalty of perjury.  *See United States v. Khalje*, 658 F.2d 90, 91 (2d Cir. 1981).  Under 18 U.S.C. § 2(b), "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."  An individual is liable under 18 U.S.C. § 1546 even when the intermediary who actually presents the false statement has no criminal intent and hence is innocent of the substantive crime charged.  *See, e.g.*, *United States v. West Indies Transp.*, 127 F.3d 299, 307 (3d Cir. 1997) (affirming conviction under 18 U.S.C. § 1546 and finding irrelevant whether immigrants who submitted false information lacked criminal intent so long as labor recruiter "intentionally caused them to submit false information").

Defendant Forero knowingly made false representations about the nature, location, and terms and conditions of work to Plaintiffs, promising them jobs planting pine trees in North Carolina for $7.50 per hour.  Am. Compl. ¶¶ 41, 48; A. Aguilar Aff. ¶ 8; C. Aguilar Aff. ¶ 7; M. Coto Aff. ¶ 6; E. Espinoza Aff. ¶ 5; W. Hernandez Aff. ¶ 5; A. Mendoza Aff. ¶ 7; H. Oreno Aff. ¶ 8; C. Pinto Aff. ¶ 6; H. Rodas Aff. ¶ 7; L. Rodriguez Aff. ¶ 6.   However, Defendant Forero

intended to use Plaintiffs as nursery workers—who are ineligible for H-2B visas—in Connecticut, laboring for considerably less than minimum wage, and at a prevailing wage rate that differs from that for pine tree workers in North Carolina.  Am. Compl. ¶ 37.  Defendants conspired to obtain foreign labor certifications and visas under the H-2B program by submitting fraudulent foreign labor certifications to state and federal departments of labor and to the U.S. Citizenship and Immigration Services ("USCIS").  *Id.* ¶ 36; Foreign Labor Certifications Obtained from the North Carolina Employment Security Commission ("Foreign Labor Certifications") at 71-188 (a copy of Foreign Labor Certifications is attached as Exhibit S to the Hallett Decl.). Defendant Forero declared that the foreign labor certifications he submitted were true and correct under penalty of perjury, Foreign Labor Certifications at 72, 128, and thus violated 18 U.S.C. § 1546(a).  Defendant Forero also submitted—either directly or indirectly through their agents— applications for non-immigrant visas in Plaintiffs' names that contained false statements about the nature, location, and terms and conditions of work offered to Plaintiffs.  *See* 22 C.F.R. § 41.103 (all applicants for non-immigrant visas must submit DS-156 Application for Non-Immigrant Visa).  Plaintiffs unknowingly repeated the false information supplied by Defendant Forero through his agent in their visa interviews at the U.S. Embassy in Guatemala City, Guatemala.  Am. Compl. ¶ 43; A. Aguilar Aff. ¶ 10; C. Aguilar Aff. ¶ 7; M Coto Aff. ¶ 6; E. Espinoza Aff. ¶ 7; W. Hernandez Aff. ¶ 6; A. Mendoza Aff. ¶ 14; H. Oreno Aff. ¶ 14; C. Pinto Aff. ¶ 8; H. Rodas Aff. ¶ 9; L. Rodriguez Aff. ¶ 8.  Thus, Defendant Forero caused false statements to be made in a visa application in violation of 18 U.S.C. § 1546(a).

Defendant Forero also committed at least two counts of mail fraud in violation of 18 U.S.C. § 1343 by mailing fraudulent applications for foreign labor certifications to the North

Carolina Employment Security Commission and the U.S. Department of Labor.  To establish a violation of 18 U.S.C. § 1343, a plaintiff must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails in furtherance of the scheme.  *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996).  A plaintiff may show fraudulent intent by (1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  Furthermore, allegations of mail fraud as a predicate act under RICO "should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent."  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993).

On or about August 30, 2005, Defendant Forero used the interstate mail system to submit two Applications for Foreign Labor Certifications from New Bern, North Carolina to the U.S. Department of Labor in Atlanta, Georgia, in which he sought labor certifications for 120 workers to plant pine seedlings in North Carolina from November 15, 2005 to September 15, 2006. Foreign Labor Certifications at 71-72, 77, 80, 86, 127-28.  *See also* Plaintiffs' H2-B visas to the United States, sponsored by Pro Tree Forestry Services (indicating that visas expired on September 15, 2006) (a copy of Plaintiffs' H-2B visas is attached as Exhibit Q to Hallett Decl.). Defendant Forero gave their wage as $6.32 an hour, stated that workers would be responsible for their own housing, and stated that he would pay all applicable federal and state taxes.  *Id.* at 80, 129  Defendant Forero was successful in obtaining foreign labor certifications, which he then used to apply for Plaintiffs' H-2B visas.  Am. Compl. ¶ 39.

However, Defendant Forero never intended to employ Plaintiffs planting pine trees in North Carolina at the prevailing wage of $6.32 an hour. *Id.* ¶ 37. Instead, Defendant Forero fraudulently obtained the foreign labor certifications with the intent to use any workers he was able to recruit and who were granted visas for nursery work in Connecticut. *Id*. Defendant Forero had no intention of paying Plaintiffs the prevailing wage of $6.32 an hour, letting alone the $7.50 an hour he promised to Plaintiffs in Guatemala. *See, e.g*., Am. Compl. ¶ 73. Indeed, Plaintiffs were told immediately upon arriving in Connecticut that they would be paid by the piece and not by the hour. *Id*. ¶ 70.

Defendant Forero had a strong motive to fraudulently obtain foreign labor certifications. Recruitment of foreign workers was central to Defendant Forero's plan to profit from human trafficking and forced labor. By hiring foreign workers who were unfamiliar with the American legal system, who spoke little or no English, who had little or no prior experience living in the United States, who had little or no formal education, who would necessarily incur significant debt to travel to the U.S., and who could be manipulated to feel at risk of deportation if they complained of their work or living conditions, Defendant Forero was able to take advantage of them, pay them below minimum wage, and extract more work from them than he could have done to U.S. workers. A. Aguilar Aff. ¶¶ 48-50; C. Aguilar Aff. ¶ 61; M. Coto Aff. ¶¶ 36-40; E. Espinoza Aff. ¶¶ 49-50; W. Hernandez Aff. ¶ 41; A. Mendoza Aff. ¶ 61; H. Oreno Aff. ¶¶ 53-57; H. Rodas Aff. ¶¶ 40-41. Moreover, by procuring H-2B visas, which are exclusively for *non-agricultural* work and do not authorize employment in nursery work, *see* 8 U.S.C. 1101(a)(15)(H); 8 C.F.R. 214.2(h); rather than H-2A visas, which are more burdensome for employers to obtain but which *do* authorize agricultural employment such as nursery work,

42

Defendant Forero was able to evade the more onerous worker protections required of employers of H-2A workers.  Am. Compl. ¶ 30.

There is also strong circumstantial evidence that Defendant Forero never intended to employ Plaintiffs in North Carolina planting pine trees.  Forero told Plaintiffs that they would be paid $7.50 an hour, while Defendant Forero's Application for Foreign Labor Certification states that Plaintiffs would be paid $6.32, the prevailing rate for North Carolina pine work.  *Compare* Foreign Labor Certifications at 84 *with* Am. Compl. at ¶ 41. The discrepancy between the two wage amounts suggests that Defendant Forero never intended to keep either promise.  Instead, Defendant Forero stated whatever wage was needed to get the foreign labor certifications and to induce Plaintiffs to come to the United States.  Once he had accomplished both goals, and Plaintiffs had arrived in Connecticut, Defendant Forero told Plaintiffs that they would not be paid by the hour, but by the piece.  Am. Compl. ¶ 73; A. Aguilar Aff. ¶ 24; C. Aguilar ¶ 25; M. Coto Aff. ¶ 28; E. Espinoza Aff. ¶ 29; W. Hernandez Aff. ¶ 31; A. Mendoza Aff. ¶ 43; H. Oreno Aff. ¶ 43; H. Rodas Aff. ¶ 28; L. Rodriguez Aff. ¶ 23.

In addition, the fact that the March Plaintiffs were immediately transported from the airport in North Carolina to Connecticut, and that Defendant Forero already had other foreign workers living in the apartment in Connecticut, strongly suggests that Defendant Forero submitted the Foreign Labor Application with a fraudulent intent.  Am. Compl. ¶¶ 50-64; M. Coto Aff. ¶ 17; E. Espinoza Aff. ¶ 21; A. Mendoza Aff. ¶ 33.[17]  In Connecticut, Defendant Forero supplied Plaintiffs with housing contrary to what he stated in his foreign labor certification.  *Compare* Am. Compl. ¶¶ 62-62, 68; A. Aguilar Aff. ¶ 20; M. Coto Aff. ¶¶ 17-18; E. Espinoza Aff. ¶ 22; W. Hernandez Aff. ¶ 18; A. Mendoza Aff. ¶ 36; H. Oreno Aff. ¶ 23; C.

---

[17] A Freedom of Information Act request did not yield any record of Defendants Forero or Pro Tree filing applications for foreign labor certifications in Connecticut.  *See* Desormeau Declaration, attached at Exhibit T to Hallett Decl.

Pinto Aff. ¶ 22; H. Rodas Aff. ¶¶ 23-24; L. Rodriguez Aff. ¶ 20 *with* Foreign Labor Certifications at 80, 129.  Furthermore, Plaintiffs never received tax statements from Defendant Forero, despite his representation that he would pay all required Federal and state taxes. *Compare* Am. Compl. ¶ 135 *with* Foreign Labor Certifications at 80, 129.  Defendants Forero and Aranda told Plaintiffs at various times that Plaintiffs did not need Social Security cards or numbers, and only procured them toward the end of Plaintiffs' employment, suggesting that Defendants were not paying federal taxes from the beginning as they claimed.  *See, e.g.*, C. Aguilar Aff. ¶ 69; M. Coto Aff. ¶ 51; W. Hernandez Aff. ¶ 57; A. Mendoza Aff. ¶ 79.

All of these facts provide strong circumstantial evidence that Defendant Forero never intended to abide by the representations he made in his foreign labor certifications. Plaintiffs have therefore shown that Defendant Forero intentionally participated in a scheme to defraud using the interstate mail system, and have sufficiently established with particularity the time, place, and content of the fraudulent communication.

Plaintiffs have also established that Defendants Forero and Aranda committed at least twelve predicate acts of human trafficking, *see supra* Section II.A, and twelve predicate acts of forced labor, *see supra* Section II.B., one against each of the named Plaintiffs, in violation of 18 U.S.C. §§ 1589-90.[18]

### iii. The Pro Tree Defendants Engaged in a Continuous Pattern of Racketeering Activity.

Plaintiffs have also shown the additional elements necessary to establish a pattern of racketeering activity.  In *H. J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237 (1989), the Supreme Court held that two predicate acts are necessary but not sufficient to establish a pattern, which "embraces criminal acts that have the same or similar purposes, results, participants,

---

[18] Plaintiffs do not allege predicate acts under the Hobbs Act, 18 U.S.C. § 1591. Any injury arising from robbery/extortion has been remedied by the settlement with the Imperial Defendants.

victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 40. The Second Circuit has interpreted this requirement to mean that the predicate acts must be related to each other ("horizontal" relatedness) and must be related to the enterprise in question ("vertical" relatedness). *United States v. Indelicato*, 865 F.2d 1370, 1381 (1989); *United States v. Long*, 917 F.2d 691, 697 (2d Cir. 1990). Vertical relatedness can be established by showing either that (1) the crimes related to the activities of the enterprise, or that (2) defendant was able to commit the crimes solely because of his position in the enterprise. *United States v. Amato*, 86 Fed. App'x 447 (2d Cir. 2004); *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992).

The predicate acts in question here satisfy both the "horizontal" and "vertical" relatedness requirements. The predicate acts were committed against the same individuals, the named Plaintiffs, and for the same purposes, furtherance of a criminal worker exploitation scheme and personal profit. Furthermore, Defendants Forero and Aranda were exclusively able to carry out their criminal scheme through their association with Pro Tree. The predicate acts—human trafficking and forced labor, mail fraud, and visa fraud—are directly related to the activities of Pro Tree. As a labor contracting company, Pro Tree's central activities included the procurement of labor from foreign countries, the petition for foreign labor certifications and work visas, and the supervision of workers at job sites in the United States. The predicate acts alleged arose directly from these activities.

Plaintiffs have also alleged sufficient continuity to establish a pattern of racketeering activity. *H.J., Inc.*, 492 U.S. at 241-42; *Long*, 917 F.2d at 697. Continuity "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J., Inc.*, 492 U.S.

at 241-42.  The Second Circuit has established two years as the relevant time period required to show closed-ended continuity in racketeering activity.  *See GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 467 (2d Cir. 1995); *see also Metromedia Co. v. Fugazy*, 983 F.2d 350, 369 (2d Cir. 1992) (finding closed-ended continuity when predicate acts occurred over a period of two years); *Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir. 1989) (finding closed-ended continuity when predicate acts occurred over a "matter of years").

In this case, Defendants Forero and Aranda engaged in criminal activity over the course of at least two years through the conduct of Pro Tree.  Labor certifications show that Pro Tree was engaged in criminal worker exploitation schemes similar to the one perpetrated against plaintiffs as early as 2001.  Foreign Labor Certifications at 1-70; *see also id.* at 14 (email from North Carolina Employment Security Commission warning Pro Tree that failure to hire available U.S. workers would adversely effect their foreign labor certifications after state referral agency had unsuccessfully attempted to refer workers seeking employment).   In addition, several Plaintiffs observed another group of workers in Pro Tree's employ shortly after they arrived in Connecticut.  M. Coto Aff. ¶ 17; E. Espinoza Aff. ¶ 21; A. Mendoza Aff. ¶ 33.  These workers were apparently ordered into the same van that brought Plaintiffs from North Carolina.  E. Espinoza Aff. ¶ 21.  Plaintiffs believe that these workers were part of a separate criminal worker exploitation scheme perpetrated by Defendants Forero and Aranda.

### iv. Appropriate Damages for the Pro Tree Defendants' Racketeering Activities.

Plaintiffs suffered an economic injury as a result of the racketeering activity.  As such, they are entitled to recover treble damages.  18 U.S.C. § 1964(c).  The Supreme Court has held that there exists "no distinct 'racketeering injury' requirement."  *Sedima v. Imrex Co.*, 473 U.S. 479, 495 (1985).   Therefore, Plaintiffs must only show that they were injured as a result of the

46

underlying predicate acts themselves.  In this case, Plaintiffs sustained injuries as a direct result of being subjected to human trafficking and forced labor, *see supra* Sections II.A & II.B, and as a result of the frauds perpetrated against Plaintiffs, *see infra* Section II.F.[19]  Plaintiffs have therefore established a concrete injury as a result of the predicate acts.  They seek treble recovery of the compensable damages available for Sections 1589 and 1590.  This totals $4,086,000 for the forced labor (Section 1589) claims, and $3,600,000 for the human trafficking (Section 1590) claims.  Accordingly, Plaintiffs seek total damages of $7,686,000 through RICO.

### F.  Fraud (Claims 7 and 8).

The Pro Tree Defendants injured Plaintiffs by defrauding them (Counts 7 and 8).  Two separate frauds occurred: the first when the Pro Tree Defendants recruited Plaintiffs in Guatemala ("Guatemala Fraud") and the second when plaintiffs worked for the Pro Tree defendants in the U.S. ("Connecticut Fraud").  Plaintiffs seek recovery for both.

#### i.  The Pro Tree Defendants Committed Fraud by Making Misrepresentations to the Plaintiffs.

Connecticut law establishes the elements of fraud:

> (1) that a false representation of fact was made; (2) that the party making the representation knew it to be false; (3) that the representation was made to induce action by the other party; and (4) that the other party did so act to her detriment.

*Chase Manhattan Mortg. Corp. v Machado*, 83 Conn. App. 183, 188 (2004) (quoting *Carr v. Fleet Bank*, 73 Conn. App. 593, 505 (2002)).

---

[19] Although RICO does not provide a general remedy for personal injuries caused by predicate acts, *see Sedima*, 473 U.S. at 497, Congress intended injuries caused by violations of 18 U.S.C. §§ 1589-91 to be compensable under 1964(c).  The legislative history confirms that Congress considered the civil remedy when adding 18 U.S.C. § 1589-91 as predicate acts.  *See, e.g.*, Senate Judiciary Committee, Trafficking Victim Protection Reauthorization Act of 2003, 108 H. Rpt. 264 (2003) ("The bill adds three new predicate crimes to the RICO statute.  The first relates to forced labor, the second relates to slavery, and the third relates to sex trafficking of children.  Congress enacted the Racketeer Influenced and Corrupt Organization (RICO) provisions as part of the Organized Crime Control Act of 1970 to increase civil and criminal consequences for crimes under certain circumstances . . . *Civil RICO allows the injured person to recover treble damages, costs, and attorneys' fees*.") (emphasis added).

**The Guatemala Fraud.** The Guatemala Fraud consisted of Defendants' fraudulent representations that if Plaintiffs agreed to employment, they would be employed in forestry work in North Carolina at a rate of $7.50 per hour.  Am. Compl. ¶¶ 41, 48, 229; A. Aguilar Aff. ¶ 8; C. Aguilar Aff. ¶ 7; M. Coto Aff. ¶ 6; E. Espinoza Aff. ¶ 5; W. Hernandez Aff. ¶ 5; A. Mendoza Aff. ¶ 7; H. Oreno Aff. ¶ 8; C. Pinto Aff. ¶ 6; H. Rodas Aff. ¶ 7; L. Rodriguez Aff. ¶ 6.  The Pro Tree defendants made these false representations of fact through Guillermo Sazo, a labor recruiter in Guatemala, who was acting as Defendants' agent. Am. Compl. ¶¶ 39-41, 46-49; *see also* A. Aguilar Aff. ¶¶ 6-10; C. Aguilar Aff. ¶¶ 4-9; M. Coto Aff. 4-7; E. Espinoza Aff. ¶¶ 4-8; W. Hernandez Aff. ¶¶ 5-7; A. Mendoza Aff. ¶¶ 4-16; H. Oreno Aff. ¶¶ 7-17; C. Pinto Aff. ¶¶ 5-9; H. Rodas Lopez Aff. ¶¶ 7-10.  Because the Pro Tree Defendants had in fact already contracted with Imperial Nurseries in Connecticut to supply workers for their operations, and intended for Plaintiffs to work there, the Pro Tree Defendants knew these representations were untrue.  Am. Compl. ¶¶ 23-29, 69, 230.  Moreover, Pro Tree Defendants knew that Plaintiffs would not be paid at the rate of $7.50 per hour, but rather would be paid a "piece rate."  *Id*. ¶¶ 70, 230; A. Aguilar Aff. ¶ 24; C. Aguilar ¶ 25; M. Coto Aff. ¶ 28; E. Espinoza Aff. ¶ 29; W. Hernandez Aff. ¶ 31; A. Mendoza Aff. ¶ 43; H. Oreno Aff. ¶ 43; H. Rodas Aff. ¶ 28; L. Rodriguez Aff. ¶ 23.

The Pro Tree Defendants made these representations to induce Plaintiffs to obtain work visas, purchase plane tickets to the United States, and enter into employment relationships.  *Id*. ¶¶ 41-45, 47-49, 231.  The Plaintiffs fulfilled the activity that was induced by the Pro Tree defendant's Guatemala fraud; at substantial personal cost, they obtained work visas, purchased plane tickets, and traveled to the United States to enter into an employment relationship with the Pro Tree defendants.  *Id*. ¶¶ 41-45, 47-49, 232; *see also* A. Aguilar Aff. ¶¶ 12-13; C. Aguilar Aff.

48

¶¶ 8-10; M. Coto Aff. 7-8; E. Espinoza Aff. ¶¶ 7-9; W. Hernandez Aff. ¶¶ 7-9; A. Mendoza Aff. ¶¶ 13-17; H. Oreno Aff. ¶¶ 11-12, 15-17; C. Pinto Aff. ¶¶ 9-10; H. Rodas Aff. ¶¶ 10.

Because of their reliance on Defendants' fraudulent representations, Plaintiffs suffered significant damages.  Plaintiffs took out loans in Guatemala to cover the costs of their visa fees and air travel to come to the United States, some at high or even extortionate rates.  *See, e.g.*, C. Aguilar Aff. ¶ 10 (reporting an interest rate of approximately 4% per month); W. Hernandez Aff. ¶ 8-9 (reporting an interest rate of approximately 5% per month); C. Pinto Aff. ¶ 10 (reporting an interest rate of 8% per six months).  In some cases, Plaintiffs were forced to use their family homes as collateral.  *See* C. Aguilar Aff. ¶ 88; M. Coto Aff. ¶ 67; W. Hernandez Aff. ¶¶ 9, 72-73.

In leaving for the United States, Plaintiffs left their families, who depended upon their income, without a source of regular financial support.  A. Aguilar Aff. ¶¶ 12-13; A. Mendoza Aff. ¶¶ 13-17; C. Aguilar Aff. ¶¶ 8-10; C. Pinto Aff. ¶¶ 9-10; E. Espinoza Aff. ¶¶ 7-9; H. Rodas Lopez Aff. ¶¶ 10; H. Oreno Aff. ¶¶ 11-12, 15-17; M. Coto Aff. 7-8; W. Hernandez Aff. ¶¶ 7-9. Plaintiffs did so believing that they would soon be able to send money home to their families once they began receiving pay checks from Defendants.  *Id.*  In fact, however, Plaintiffs received so little income from their wage payments in Connecticut that they were often unable to send any money home; several Plaintiffs even had to rely upon family members in Guatemala to wire them money for food.  Am. Compl. ¶ 87; C. Aguilar Aff. ¶ 54; W. Hernandez Aff. ¶¶ 58-59. Meanwhile, the interest from their debts continued to mount, endangering their families' livelihood and in some cases—especially for those who were forced to designate their family homes as collateral for their loans—risking repossession and homelessness.  *See, e.g.*, C. Aguilar Aff. ¶ 88; M. Coto Aff. ¶ 67; W. Hernandez Aff. ¶¶ 9, 72-73.

49

The **"Connecticut Fraud."**    The "Connecticut Fraud" consisted of Defendants' fraudulent representations in Connecticut that Plaintiffs were not free to leave Defendants' employment, and that if they disobeyed Defendants' commands, Defendants had the power to effectuate their arrest or deportation by U.S. immigration and/or law enforcement officials.  Am. Compl. ¶¶ 95, 97, 101, 102-06, 146, 238; A. Aguilar Aff. ¶¶ 47-50; C. Aguilar Aff. ¶¶ 58-62; M. Coto Aff. ¶¶ 36-39; E. Espinoza Aff. ¶¶ 51-56; W. Hernandez Aff. ¶¶ 45-49; A. Mendoza Aff. ¶¶ 49-51; H. Oreno Aff. ¶¶ 51-52; C. Pinto Aff. ¶¶ 54-57; L. Rodriguez Aff. ¶¶ 43-46.  The Pro Tree Defendants repeatedly made such false representations of fact at multiple times during Plaintiffs' employment.   Am. Compl., ¶¶ 95, 97, 101, 102-06, 146, 238.   The Pro Tree Defendants knew that these representations were false.  *See id.* ¶ 239.  For instance, Defendants Forero and Aranda knew that the four Plaintiffs who fled in early April were not in fact imprisoned by U.S. authorities after escaping, despite their statements to the contrary.  *See id.* ¶ 103.  Defendant Forero also knew that he had not in fact "deported" Plaintiff Santos Catu for his disobedience, as Forero claimed.  *See id.* ¶¶ 174-75.  Further, having applied for Foreign Labor Certifications and worked as labor recruiters in the United States for at least five years, *see* Foreign Labor Certifications at 1-90, it is reasonable to infer that Defendants Forero and Aranda knew that Plaintiffs were lawfully admitted to the United States on H-2B visas and were not in any way legally forbidden from walking freely in public, traveling, or using the public transit system, or otherwise in danger of imprisonment or deportation by U.S. officials. *See* Am. Compl. ¶ 239.  Defendants Forero and Aranda also knew that they had no legal right to retain Plaintiffs' passports or open their mail.  *See id.* ¶¶ 84, 94.

The Pro Tree Defendants made these false representations to induce Plaintiffs to fear U.S. law enforcement and to continue laboring for Pro Tree, even though Plaintiffs were being paid

far less than promised, and far below minimum wage, *id*. ¶¶ 127, 134, for difficult work that was not what had been promised.   *Id*. ¶¶ 108, 139, 141, 142, 240.   Indeed, at various points, Defendants Forero and Aranda admitted as much to Plaintiffs.   *See, e.g.*, A. Mendoza Aff. ¶ 45 ("[Forero and Aranda] told me that they wanted to keep my passport so that if I did not like the work, I would not be able to leave.   They said that other employees had complained about the work and left, but that we did not have that choice.").

Because of these false representations of fact, Plaintiffs continued to labor for Pro Tree longer than they otherwise would have.   During this entire time, Plaintiffs were earning a fraction of the wages they had been promised: an overall average less than $3.75 per hour, instead of $7.50 per hour.   Am. Compl. ¶ 134; A. Aguilar ¶ 40; C. Aguilar Aff. ¶ 66; M. Coto Aff. ¶ 50; E. Espinoza Aff. ¶¶ 36-37; W. Hernandez Aff. ¶ 56; A. Mendoza Aff. ¶ 76; H. Oreno Aff. ¶ 47; C. Pinto Aff. ¶ 35; H. Rodas Aff. ¶ 36-37; L. Rodriguez Aff. ¶ 38.   Due to Defendants' misrepresentations about Plaintiffs' immigration status in the United States, Plaintiffs felt unable to seek the help of U.S. law enforcement in addressing either their illegal working conditions, or the robbery of the apartment in which they were forced to live.   Am. Compl. ¶ 63.   When Plaintiffs finally did escape, they fled the apartment in secrecy to avoid deportation that the Pro Tree defendants had threatened.   *Id*. ¶¶ 170, 175, 176, 241; A. Aguilar Aff. ¶¶ 65-66; C. Aguilar Aff. ¶¶ 72-76; M. Coto Aff. ¶¶ 59-61; E. Espinoza Aff. ¶¶ 58-61; W. Hernandez Aff. ¶¶ 62-64; A. Mendoza Aff. ¶¶ 83-86; H. Oreno Aff. ¶¶ 64-67; C. Pinto Aff. ¶¶ 58-61; H. Rodas Aff. ¶¶ 52-57; L. Rodriguez Aff. ¶¶ 54-57.

### ii.   Plaintiffs Are Entitled to Damages for the Fraud Claims.

Plaintiff's pecuniary damages stemming from the Pro Tree Defendants' fraudulent representations include (1) a loss of promised wages and (2) expenses relating to Plaintiffs'

51

travel to the United States.  As discussed, Plaintiffs consider the settlement with the Imperial defendants to satisfy the damages related to unpaid wages.  Accordingly, Plaintiffs do not request entry of judgment against the Pro Tree defendants for unpaid wages.  Rather, with respect to the fraudulent representation claims, Plaintiffs seek recovery for their expenses incurred in traveling to the United States in reliance upon the defendants' fraudulent representations.

All plaintiffs incurred the costs of airfare from Guatemala to the United States and visa fees.  The cost of each man's plane ticket was approximately $725.00.  *See* Exhibit P attached to the Hallett Decl. (airline ticket receipt and itinerary of Carlos Aguilar, showing price of 5,597.65 quetzales, or $783.67[20]); Ex. O attached to Hallett Decl. (Hugo Oreno's receipt); *see also* H. Oreno Aff. ¶ 15 (recalling that the labor recruiter asked for 6,400 quetzales, or $896).  The cost of each man's visa fee was approximately 1,600 quetzales, or approximately $224.  H. Oreno Aff. ¶ 11.  Plaintiffs took out loans in Guatemala to cover these costs.  Plaintiffs also borrowed various amounts of additional money to support their families until such time as they were able to begin sending portions of their anticipated paychecks home; as noted above, their wages were ultimately so low that Plaintiffs were often unable to send home money for their families' support.  *See, e.g.,* A. Aguilar Aff. ¶¶ 43-44; A. Mendoza Aff. ¶ 81; C. Aguilar ¶ 89; H. Oreno Aff. ¶¶ 62-63.  Plaintiffs borrowed between 8,000 quetzales (L. Rodriguez Aff. ¶¶ 9-10) and 33,000 quetzales (M. Coto Aff. ¶ 8) in reliance on Defendants' fraudulent promises.  *See also* A. Aguilar Aff. ¶ 13; C. Aguilar Aff. ¶ 10; E. Espinoza Aff. ¶ 9; W. Hernandez Aff. ¶ 8-9; A. Mendoza Aff. ¶ 17; H. Oreno Aff. ¶ 16; C. Pinto Aff. ¶ 10; H. Rodas Aff. ¶ 10.  The exact amounts of Plaintiffs' loans are enumerated *infra* Section III.C., in the computation of damages.

---

[20] Plaintiffs base their conversions on an exchange rate of 0.14 dollars per quetzal, recorded on April 5, 2006, available online at http://www.oanda.com/.

In addition to these out-of-pocket damages, Connecticut law provides for punitive damages on fraud claims where there is "a reckless indifference to the rights of others or an intentional and wanton violation of those rights."  *See DeDantis v. Piccadilly Land Corp.*, 3 Conn. App. 310, 315 (1985) (citing *Collens v. New Canaan Water Co.*, 155 Conn. 477, 489 (1967)).   Here, the Guatemala and Connecticut frauds demonstrate precisely such reckless indifference to the rights of plaintiffs.  Am. Compl. ¶¶ 235, 243.

In Connecticut law, punitive or exemplary damages for fraud include attorneys' fees and costs.  *See, e.g.*, *Chykirda v. Yanush*, 131 Conn. 565, 568 (1945) ("Punitive damages are limited to the costs of litigation less taxable costs, but within that limitation the extent to which they are awarded is in the discretion of the trier."); *Wedig v. Brinster*, 469 A.2d 783 (Conn. App. 1983) ("Punitive or exemplary damages in a fraud case include attorney's fees.") (affirming trial court's award of $12,068.69 in compensatory damages and $10,000 in reasonable attorneys' fees as punitive damages on fraud claim).   Plaintiffs thus seek punitive damages in the amount of attorneys' fees and costs incurred in the litigation.[21]

### G.  Intentional Infliction of Emotional Distress (Claim 10).

The Pro Tree Defendants injured Plaintiffs by intentionally inflicting emotional distress (Claim 10).  Under Connecticut law, to prevail on a claim of intentional infliction of emotional distress, a plaintiff must establish four elements:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

*Gagnon v. Housatonic Valley Tourism Dist. Com'n*, 92 Conn. App. 835, 846 (2006) (quoting *Petyan v. Ellis*, 200 Conn. 243, 253 (1986)).

---

[21] *See supra* note 9.

### i. The Pro Tree Defendants Are Liable for Intentional Infliction of Emotional Distress.

Defendants' actions—transporting Plaintiffs without their knowledge or consent from North Carolina to Connecticut, withholding their passports, forcing them to work for long hours at frightfully low pay on threat of imprisonment or deportation, all the while intimidating, berating, and denigrating them with insults and racial slurs—constitute extreme and outrageous conduct.  Defendants have made no effort to contradict Plaintiffs' allegations. This conduct "exceeds all bounds usually tolerated by decent society."  *Benton v. Simpson*, 78 Conn. App. 746, 753 (2003).  Defendants' actions here quite clearly pass the Connecticut Supreme Court's test: that "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!"  *Morrissey v. Yale University*, 268 Conn. 426, 428 (2004).

Connecticut courts note that, even having shown that a defendant's action is outrageous, plaintiffs can only "recover for intentional infliction of emotional distress . . . if they have incurred severe emotional distress."  Emotional distress may be manifested as:

> [H]ighly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. Generally, courts find liability only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and duration of the distress are factors to be considered in determining its severity.

*Zulawski v. Stancil*, No. 05-000203S, 2006 WL 2089470 (Ct. Super. Ct. July 14, 2006). Evidence of fear of reprisal is also a factor which may support an award of damages based on emotional distress.  *Berry v. Loiseau*, 223 Conn. 786, 810 (Conn. 1992).

In this case, Plaintiffs experienced such negative reactions and lived with a constant fear of reprisal.  Defendants showed reckless disregard for Plaintiffs' medical needs, even when Plaintiffs were seriously ill or injured.  Am. Compl. ¶¶ 139-45; A. Aguilar Aff. ¶ 37; C. Aguilar

54

Aff. ¶ 39-41; M. Coto Aff. ¶ 52-57; E. Espinoza Aff. ¶¶ 39-40; W. Hernandez Aff. ¶¶ 50-51; A. Mendoza Aff. ¶¶ 72-73; H. Oreno Aff. ¶¶ 41-42; C. Pinto Aff. ¶¶ 41-44; H. Rodas Aff. ¶¶ 47-51; L. Rodriguez Aff. ¶¶ 34-35.  Defendants terrorized, insulted, and berated Plaintiffs regularly. Defendants used racial slurs to offend Plaintiffs. M. Coto Aff. ¶ 34; L. Rodriguez Aff. ¶ 32. Defendants threatened Plaintiffs with arrest or deportation if Plaintiffs did not meet unspecified quotas, disobeyed orders, became ill, or otherwise displeased Defendants.  Am. Compl., ¶¶ 95, 97, 101, 102-06, 146, 238; A. Aguilar Aff. ¶¶ 47-50; C. Aguilar Aff. ¶¶ 58-62; M. Coto Aff. ¶¶ 36-39; E. Espinoza Aff. ¶¶ 51-56; W. Hernandez Aff. ¶¶ 45-49; A. Mendoza Aff. ¶¶ 49-51; H. Oreno Aff. ¶¶ 51-52; C. Pinto Aff. ¶¶ 54-57; L. Rodriguez Aff. ¶¶ 43-46.  Plaintiffs lived in constant fear of punishment or deportation, and felt that they were under constant surveillance. Defendants preyed on Plaintiffs' unfamiliarity with the American legal system, their feelings of isolation and helplessness, and their worries about supporting their families in Guatemala and their concerns about their mounting debt.  Plaintiffs felt worried, angry, humiliated, and afraid. A. Aguilar Aff. ¶¶ 48-49; C. Aguilar Aff. ¶ 49; M. Coto Aff. ¶¶ 42, 47, 57; E. Espinoza Aff. ¶¶ 43, 50, 55-56; W. Hernandez Aff. ¶ 41; A. Mendoza Aff. ¶¶ 51, 61, 73 ; H. Oreno Aff. ¶¶ 40, 61-63; H. Rodas Aff. ¶¶ 53-54.

These unpleasant emotional responses to their mistreatment were long-lasting.  Even after escaping from Pro Tree, Plaintiffs continued to feel upset and distressed by their experience.  *See* C. Aguilar Aff. ¶¶ 86, 91 ("I still carry with me a feeling of weakness and exploitation. . . .  The humiliation of having been so exploited has stayed with me ever since I escaped.  I will never forget what happened".); M. Coto Aff. ¶ 70-71 (describing continuing depression, panic attacks, and feelings that "things are unresolved"); H. Oreno Aff. ¶ 75-77 (describing feelings of sadness, depression, and hopelessness); H. Rodas Aff. ¶¶ 64, 66-67 (describing feeling helpless,

vulnerable, traumatized, and haunted); L. Rodriguez Aff. ¶¶ 64-65 (describing feeling angry and robbed).

In addition, even after escaping from Pro Tree, Plaintiffs continued to worry about their debts in Guatemala, their ability to earn enough money to live and support their families, and the uncertainty of their immigration status in the United States.  A. Aguilar Aff. ¶¶ 72-73; C. Aguilar Aff. ¶¶  87-89; M. Coto Aff. ¶¶ 66-67; E. Espinoza Aff. ¶¶ 68-71; W. Hernandez Aff. ¶¶  72-73; A. Mendoza Aff. ¶¶ 93-95; H. Oreno Aff. ¶ 72, 77; H. Rodas Aff. ¶ 65; L. Rodriguez Aff. ¶ 59. At the same time, Plaintiffs also continued to fear reprisal from Defendants.   Remembering Defendants' threats of abuse of the legal process during the period of their employment, Plaintiffs continued to fear, even after escaping, that Defendants could effect their arrest or deportation.   A. Aguilar Aff. ¶ 71; C. Aguilar Aff. ¶¶ 85-86; M. Coto Aff. ¶¶ 73-83; W. Hernandez Aff. ¶¶ 70-71, 74; A. Mendoza Aff. ¶ 97; H. Oreno Aff. ¶¶ 73.  Several Plaintiffs attest that, for several months after their escape from Pro Tree, they would not leave their homes at night for fear that Defendants might send Immigration to deport them.  *See, e.g.*, C. Aguilar Aff. ¶¶ 85-86; W. Hernandez Aff. ¶ 71.  All these allegations, taken as true, are sufficient to establish a claim for intentional infliction of emotional distress.

Neither proof of economic injury nor proof of medical expenses is required for a plaintiff to prevail on an intentional infliction of emotional distress claim.  *See, e.g., Berry*, 223 Conn. at 808 ("[A]n award for intentional infliction of emotional distress need not be supported by proof of incurred medical expenses."); *Brouwer v. Haddam Hills Academy*, 2002 WL 180974, *5 (Conn. Super. 2002) ("[N]either expert testimony nor incurred medical expenses are necessary to prove the existence of such an injury.").  Connecticut courts further recognize that a claim of

intentional infliction of emotional distress may support an award of exemplary or punitive damages. *Berry*, 223 Conn. at 811.

### ii. Appropriate Damages for Intentional Infliction of Emotional Distress.

The Plaintiffs should be awarded significant damages for the emotional distress injuries they sustained. Longstanding precedent supports an award of such damages. For example, in *Berry*, 223 Conn. at 808, the jury awarded the plaintiff $50,000 for intentional infliction of emotional distress, plus additional punitive damages. The Supreme Court upheld this award, even though the "'plaintiff never sought any medical or other treatment for his alleged injuries and never incurred any medical or other expenses,'" *id.* at 808, because "an award for intentional infliction of emotional distress need not be supported by proof of incurred medical expenses." *Id.*

Similarly, in *Brouwer v. Haddam Hills Academy*, No. 99-0087906S, 2002 WL 180974, (Conn. Super. Jan. 11, 2002), the Superior Court upheld a jury award of $50,000 to plaintiff for intentional infliction of emotional distress (out of a total recovery of $260,000 in non-economic damages plus $63,485 in economic damages). The plaintiff in *Brouwer* was induced to leave her former job and enter into defendant's employment as education director; during her thirteen days of employment, she argued that the suffered "serious emotional harm" as a result of her supervisor's "physically confrontational manner towards her" during meetings. *Id.* at *3. At trial, Brouwer testified as to her continuing feelings of self-doubt and fears of retaliation after she submitted her resignation. While Brouwer produced no evidence of doctor's visits or psychological counseling, the Superior Court held that "neither expert testimony nor incurred medical expenses are necessary to prove the existence of such an injury." *Id.* at *5; *see also Oakes v. New England Dairies, Inc.,* 219 Conn. 1, 14-15 (1991).

57

Certainly, Defendants in this case engaged in more egregiously abusive treatment of Plaintiffs that the abuse at issue in *Brouwer*, and, consistent with *Brouwer*, Plaintiffs have presented detailed and compelling sworn statements as to its effects.  Their affidavits, submitted here, together with the allegations of the Amended Complaint, all of which are deemed admitted, are sufficient to prove their claim of intentional infliction of emotional distress.

Connecticut courts further recognize that a claim of intentional infliction of emotional distress may support an award of exemplary or punitive damages.  *Berry v. Loiseau*, 223 Conn. 786, 811 (1992).  Given the egregious nature of Pro Tree Defendants' actions, such an award is merited here.  In Connecticut, punitive damages are generally capped at the plaintiff's litigation expenses, including attorneys' fees, less taxable costs.  *Id.* at 832.

Plaintiffs therefore seek $50,000 each for intentional infliction of emotional distress.  As discussed *infra*, Part III, however, Plaintiffs believe that the emotional distress injuries overlap with injuries sustained from human trafficking and forced labor.  In addition, Plaintiffs seek punitive damages in an amount equal to attorneys' fees and costs.[22]

### H. Negligent Infliction of Emotional Distress (Claim 11).

In addition, Plaintiffs also have made out a claim of negligent infliction of emotional distress.  Under Connecticut law, a plaintiff must show that:

> (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.

*Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003).  Recovery "does not depend on proof of either an ensuing physical injury or a risk of harm from physical impact," *Perodeau v. Hartford*, 259 Conn. 729, 749 (2002) (internal quotation marks omitted); rather, the plaintiff must show

---

[22] *See supra* note 9.

that "the defendant *should have realized* that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, *might result* in illness or bodily harm." *Larobina v. McDonald*, 274 Conn. 394, 410 (2005) (emphasis added).

Here, the fact that Defendants knowingly denied Plaintiffs medical care on multiple occasions shows that Defendants did realize that their actions could cause Plaintiffs physical harm.  Moreover, Defendants knew or should have known that their persistent psychological abuse harmed Plaintiffs in a manner that manifested itself in physical symptoms of worry and nausea.  If this Court does not find for Plaintiffs on a theory of intentional infliction of emotional distress, Plaintiffs submit that they still prevail on a theory of negligent infliction of emotional distress.  Plaintiffs' well-pleaded complaint establishes "facts showing that the defendant[s] negligently breached a duty owed to the plaintiff[s]" and that under the "standard of a reasonable and prudent person . . . defendant[s] should have realized [their] acts were likely to cause plaintiff[s] such distress." *Valentino v. Charette*, 43 Conn. L. Rptr. 681, 682 (Conn. Super. June 26, 2007) (internal quotations and citations omitted).

## I.   Guatemalan Labor Code (Claim 20).

Plaintiffs also seek damages pursuant to Guatemalan law.  Article 34 of the Guatemalan Labor Code provides that foreign labor contractors who recruit in Guatemala must pay all costs relating to transportation and visa applications.  *See* Guatemalan Labor Code art. 34 (May 1, 1961) (copy of original statutory text in Spanish and English translation attached as Exhibit Y to Hallett Decl.).  With the filing of the initial complaint, Plaintiffs provided notice in accord with Fed. R. Civ. P. 44.1 that they intended to raise a claim under the Guatemalan Labor Code.  Am. Compl. ¶ 358.  Plaintiffs further submitted a certified translation of Article 34 to the initial complaint, Complaint, Ex. 1 [Docket #1], and also attach it herein.  Hallett Decl., Ex. Y.

Plaintiffs further submit the attached declaration of Kati Griffith, Assistant Professor of Employment and Labor Law at Cornell University's Industrial and Labor Relations School, who is an expert in the application of foreign labor law to U.S. legal proceedings, in support of this claim. Griffith Decl. ¶¶ 1-9. This declaration attests to the substantive provisions of Article 34. *Id.* at ¶¶ 10-12. Such declarations of foreign law experts are routinely accepted by courts as evidence of the substantive provisions of foreign law. *See Whallon v. Lynn*, 230 F.3d 450, 458 (1st Cir. 2000) (holding that statements of foreign law experts are sufficient to prove issues of foreign law.); *United States v. Jurado-Rodriguez*, 907 F. Supp. 568, 574 (E.D.N.Y. 1995) ("A court may seek the aid of expert witnesses in interpreting the law of a foreign state or of international law.").

### i. This Court Has Supplemental Jurisdiction to Hear Foreign Law Claims.

This Court may entertain claims brought pursuant to Article 34 of the Guatemalan Labor Code through an exercise of its supplemental jurisdiction. 28 U.S.C. § 1367(a).[23] Section 1367 states:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Here, the Guatemalan labor law claims are intimately related to the TVPA, ATCA, and RICO claims brought under this Court's original jurisdiction and exercise of jurisdiction is proper.

---

[23] Further, Plaintiffs request that this Court entertain the state tort claims relating to fraud and emotional distress through an exercise of this Court's supplemental jurisdiction. This Court has previously found that when an intentional infliction of emotional distress claim "arise[s] out of the same set of facts" as a federal claim, exercise of supplemental jurisdiction is warranted. *Adams v. Yale New Haven Hosp.*, No. 06-1166, 2007 WL 201244 (D. Conn. Jan. 22, 2007).

The Supreme Court has held that section 1367 jurisdiction turns on the traditional *Gibbs* test of pendant jurisdiction, that is whether the federal and supplemental claims "derive from a common nucleus of operative fact," and the relationship between the supplemental and federal claims "permits the conclusion that the entire action before the court comprises but one constitutional 'case.'" *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 164-65 (1997) (quoting *Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). *See also Kirschner v. Klemons*, 225 F.3d 227, 239 (2d Cir. 2000) (holding that Section 1367 "applies where the state law claim in question arises out of the same set of facts that give rise to an anchoring federal question claim"). Further, supplemental jurisdiction over foreign and state law claims is appropriate where the relevant factual allegations are so closely related, that the claims would "ordinarily be expected to try them all in one judicial proceeding." *Gibbs*, 383 U.S. at 725.

Second Circuit cases demonstrate that the Guatemala law claims at issue here are sufficiently related to federal claims that this Court should exercise jurisdiction pursuant to Section 1367. For example, in *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004), the court held that claims relating to sale of same movie "unquestionably derive from a common nucleus of operative fact." Similarly, in *Kirschner*, 225 F.3d at 239 (2d Cir. 2000), the court held that supplemental jurisdiction was appropriate where state law tort claims arose out of the same factual allegations of bias that formed the basis of a federal Section 1983 claim. Indeed, this Court has held that supplemental jurisdiction over claims is appropriate where "the core factual allegations are identical for all claims" even when a plaintiff must "establish some additional facts not related to the [federal] claim." *Sullivan v. Metro-North R. Co.*, 179 F. Supp. 2d 2, 6 (D. Conn. 2002). *See also Diversified Carting, Inc. v. City of New York*, 423 F. Supp. 2d 85, 99 (S.D.N.Y. 2005) (holding that court would exercise supplemental

jurisdiction over state law claims where there was an "absence of any material differences of fact, which distinguish the federal claims," therefore "mak[ing] a single adjudication appropriate").

In the present case, the facts forming the basis of the Guatemalan Labor Code claim are directly tied to facts surrounding the human trafficking claims brought through the TVPA, ATCA, and RICO.  Indeed, the Guatemala claims involve the Pro Tree Defendant's recruitment of Plaintiffs and accompanying fraudulent representations that form the heart of the 18 U.S.C. § 1590 and ATCA human trafficking claims.  Given that the Pro Tree Defendant's activity violated state, federal, and international law, it should come as no surprise that these same common facts also violated Guatemalan law.    Because these claims arise under the same nucleus of operative facts, exercise of supplemental jurisdiction pursuant to section 1367 is plainly warranted.

Just as the state law claims presented herein may be entertained under this Court's supplemental jurisdiction, so too should this Court give effect to Plaintiffs' claim which arises under Guatemalan law.  The Federal Circuit, for example, has recently confirmed that foreign law claims fall within section 1367's grant of supplemental jurisdiction to the district courts:

> [Section] 1367 provides the statutory authority for federal courts to exercise supplemental jurisdiction over claims that are outside the limited original jurisdiction of federal district courts, including those within the general jurisdiction of state courts. Therefore, because the "inherent powers" of state courts 'permit them to entertain transitory causes of action arising under the laws of foreign sovereigns,' § 1367 supplemental jurisdiction appears to include foreign law claims.

*Voda v. Cordis Corp.*, 476 F.3d 887, 894 (Fed. Cir. 2007) (citing *Tafflin v. Levitt,* 493 U.S. 455, 470 (1990) (Scalia, J., concurring)).  *See also Medigene AG v. Loyola University of Chicago*, No. 98-2026, 2001 WL 1636916 (N.D. Ill. Dec. 19, 2001) (exercising supplemental jurisdiction over foreign law claims).

No factors here counsel against adjudication of the foreign law claim.  While a court retains discretion to refrain from reviewing complex questions of foreign law, 28 U.S.C. § 1367(c), there is no need to exercise that discretion.  The Guatemalan Labor Code imposes a clear requirement on foreign labor recruiters: recruiters are obligated to pay transportation and visa fees for Guatemalans whom they recruit.  Application of this foreign labor law claim does not require resolution of any complex question of law.   Where no difficult questions are presented, this Court should exercise the supplemental jurisdiction provided by section 1367. *See Small v. City of New York*, 274 F. Supp. 2d 271, 281 (E.D.N.Y. 2003) (exercising supplemental jurisdiction over state law claims where defendant fails to show "any novel issue of state law that will necessarily be raised in relation to the claim brought against it, nor are there exceptional circumstances").  Rather, this Court has significant discretion to adjudicate claims pursuant to supplemental jurisdiction "in the manner that most sensibly accommodates a range of concerns and values."  *Crocco v. Advance Stores Co. Inc.*, No. 04-1608, 2007 WL 869062 (D. Conn. Mar. 20, 2007).

### ii.   The Pro Tree Defendants Are Liable for Violating the Guatemala Labor Code.

Article 34 of the Guatemalan Labor Code creates a plain obligation for foreign labor recruiters who operate in Guatemala: they must pay the airfare and visa expenses of those recruits who leave Guatemala for work abroad.  Article 34 states:

> The recruiting agent or the business on whose behalf he acts, must pay the costs of transportation abroad, from the place in which the worker usually lives to the place of work, including those that arise from crossing borders and in complying with regulations about migration or for any similar concepts.

Under this requirement, labor recruiters like Pro Tree are therefore liable for the transportation and visas expenses incurred by their workers.  *See* K. Griffith Decl. ¶¶ 10-12 (attesting that Article 34 creates legal duties for recruiters which, if violated, are actionable by their recruits).

The Pro Tree Defendants violated this provision and are consequently liable to Plaintiffs for these costs.  The Pro Tree Defendants, acting through an agent, recruited all Plaintiffs in Guatemala.  Am. Compl. ¶¶ 39, 47; A. Aguilar Aff. ¶ 8; C. Aguilar Aff. ¶ 7; M. Coto Aff. ¶ 6; E. Espinoza Aff. ¶ 5; W. Hernandez Aff. ¶ 5; A. Mendoza Aff. ¶ 7; H. Oreno Aff. ¶ 8; C. Pinto Aff. ¶ 6; H. Rodas Aff. ¶ 7; L. Rodriguez Aff. ¶ 6.    But the Pro Tree Defendants failed to pay the costs required by Article 34.  Am. Compl. ¶¶ 42, 42, 48, 362; A. Aguilar Aff. ¶ 12; C. Aguilar Aff. ¶ 9; M. Coto Aff. ¶ 7; E. Espinoza Aff. ¶¶ 7-9; W. Hernandez Aff. ¶ 7; A. Mendoza Aff. ¶¶ 13-16; H. Oreno Aff. ¶¶ 11-12, 15; C. Pinto Aff. ¶ 9; H. Rodas Aff. ¶10; L. Rodriguez Aff. ¶ 9.

Plaintiffs seek damages in an amount equal to the travel and visa expenses.  As described in Section II.F., *supra*, Plaintiffs believe that these same damages are also recoverable pursuant to the fraudulent activity conducted by the Pro Tree Defendants.

### III.  CALCULATION OF DAMAGES

Plaintiffs seek a total award of $7,841,418.80.  As Plaintiffs have noted, many of the legal claims brought penalize the same behavior.  Accordingly, Plaintiffs wish to recover for three separate injuries: compensatory and punitive damages relating to forced labor, compensatory and punitive damages relating to human trafficking, and compensatory damages related to out-of-pocket expenses incurred in traveling to the United States.  Further, Plaintiffs request prejudgment interest as discussed below.

### A.  Forced Labor

As demonstrated, the activities engaged in by the Pro Tree Defendants amount to forced labor in violation of state, federal, and international law.  Indeed, the Pro Tree Defendants are liable to Plaintiffs for forced labor under multiple legal claims: the state law through the tort claims of intentional and negligent infliction of emotional distress, federal claims brought pursuant to the Trafficking Victim Protection Act and federal RICO, and finally through international law, over which this Court has jurisdiction by means of the Alien Tort Claims Act. The laws the Pro Tree Defendants broke are many, and the injuries to Plaintiffs were severe. Nonetheless, Plaintiffs only seek a single recovery for their injuries relating to forced labor.

The injuries Plaintiffs received with respect to forced labor include being subjected to Defendants' repeated threats of deportation and demeaning, insulting treatment for the purpose of forcing Plaintiffs to continue laboring for them.  Not only did Plaintiffs experience fear and humiliation because of this treatment, but they were denied necessary medical care for injuries sustained while laboring for Defendants.  Their movements were also controlled in order to ensure that they could not escape and thus cease laboring for Defendants.

Plaintiffs believe that the appropriate valuation for each day spent in forced or compulsory labor is $3,000.  Because Plaintiffs worked a total of 454 days, compensatory damages for the forced labor claim amounts to a total of $1,362,000 for all twelve plaintiffs.

Further, Plaintiffs seek additional damages as punitive and/or statuory damages for the conduct that resulted.  Such damages are permissible because (a) punitive damages are proper under the TVPA, (b) punitive damages are both appropriate and routinely granted in Alien Tort Claims Act cases, and (c) statutory damages are authorized by the federal RICO statute.  As such, Plaintiffs seek an award of $2,724,000 in punitive and/or statutory damages for the forced

labor claim.  In total, the twelve plaintiffs seek $4,086,000 relating to the Pro Tree Defendants

forced labor violations.

These aggregate numbers represent the following individuals' claims:

| Plaintiff | Number of Days in Forced Labor | Compensatory Forced Labor Damages | Punitive Forced Labor Damages |
|---|---|---|---|
| Alexander Aguilar | 42 | $126,000 | $252,000 |
| Carlos Aguilar | 10 | $30,000 | $60,000 |
| Leopoldo Santos Catu | 40 | $120,000 | $240,000 |
| Santos Chajchaguin | 58 | $174,000 | $348,000 |
| Marvin Coto | 58 | $174,000 | $348,000 |
| Esteban Espinoza | 10 | $30,000 | $60,000 |
| Walter Hernandez | 58 | $174,000 | $348,000 |
| Angel Mendoza | 58 | $174,000 | $348,000 |
| Hugo Oreno | 42 | $126,000 | $252,000 |
| Carlos Pinto | 10 | $30,000 | $60,000 |
| Hector Rodas Lopez | 10 | $30,000 | $60,000 |
| Luis Amilcar Rodriguez | 58 | $174,000 | $348,000 |

## B.  Human Trafficking

Further, Plaintiffs seek recovery for the Pro Tree Defendants' violations of federal and

international law regarding human trafficking.  Multiple sources of state, federal, and

international law prohibit the same activities conducted by the Pro Tree Defendants, but

Plaintiffs do not seek double recovery.

The human trafficking claims punish a category of behavior related to, yet distinct from,

the Pro Tree Defendants' activities relating to forced labor.  As the statutory definition of a

trafficking violation indicates, the 1590 claim focuses on the act of trafficking itself and the

*means* that are used, whereas section 1589 focuses on the prohibited purposes or *ends* of the

trafficking—*i.e.*, forced labor.  In this case, the trafficking violation Plaintiffs suffered consists of

ProTree Defendants' recruitment of them in Guatemala, transportation of them to Connecticut,

and harboring of them during the period they labored at Imperial Nurseries.  These acts were committed for the prohibited purpose of obtaining their forced labor.  *See United States v. Maka*, 237 Fed. App'x 225, 227 (9th Cir. 2007) (holding that involuntary servitude and human trafficking, while related, are distinct criminal violations).

Indeed, Plaintiffs suffered distinct injuries relating to human trafficking.  Pro Tree Defendants made numerous false representations to Plaintiffs in order to induce them to accept job offers, telling Plaintiffs they would be paid $7.50 an hour to plant pine trees in North Carolina.  Rather than being transported to a job site in North Carolina, however, Pro Tree Defendants arranged to transport Plaintiffs to Hartford, Connecticut, without their knowledge or consent.  Moreover, once in Connecticut, Pro Tree Defendants confined Plaintiffs to overcrowded and dirty apartments.

As evidenced, Plaintiffs submit that appropriate compensatory damages relating to the human trafficking claims are $100,000 for each Plaintiff.  This totals $1,200,000 for the twelve Plaintiffs.  And similar to the forced labor claim, Plaintiffs are entitled to punitive or exemplary damages by virtue of the TVPA, punitive damages are also appropriate under the Alien Tort Claims Act, and statutory damages are awarded pursuant to RICO trebling.  Accordingly, Plaintiffs collectively seek $2,400,000 in punitive damages for the Pro Tree Defendants' forced labor activities.

In total, Plaintiffs seek an entry of judgment in the amount of $300,000 per Plaintiff for the trafficking claims.  This totals $3,600,000 for all twelve plaintiffs.

## C.  Travel Expenses (Compensable under Fraud and Guatemala Labor Law Claims)

Plaintiffs seek recovery of their out-of-pocket expenses, represented in Claim 7 (Guatemala Fraud) and Claim 20 (Guatemalan Labor Code).  Plaintiffs incurred substantial expenses as a result of Defendants' Guatemala Fraud, consisting of their plane fares, visa fees, and other necessary expenses associated with their travel to the United States (*i.e.*, passport fees and money to support their families in their absence).  Plaintiffs' costs associated with their plane fares and visa fees are also compensable under the Guatemalan Labor Code.  Plaintiffs' out-of-pocket expenses—not including the punitive damages Plaintiffs also seek to recover under their fraud claim—are as follows:

| Plaintiff | Total amount of debt incurred as a result of Defendants' fraud | Amount of loan in U.S. dollars[24] |
|---|---|---|
| Alexander Aguilar | 10,000 quetzales (A. Aguilar Aff. ¶ 13) | $1,400 |
| Carlos Aguilar | 27,000 quetzales (C. Aguilar Aff. ¶ 10) | $3,510 |
| Leopoldo Santos Catu | --[25] | -- |
| Santos Chajchaguin | --[26] | -- |
| Marvin Coto | 33,000 quetzales (M. Coto Aff. ¶ 8) | $4,290 |
| Esteban Espinoza | 17,000 quetzales (E. Espinoza Aff. ¶ 9) | $2,210 |
| Walter Hernandez | 18,000 quetzales (W. Hernandez Aff. ¶ 8-9) | $2,340 |
| Angel Mendoza | 12,000 quetzales (A. Mendoza Aff. ¶ 17) | $1,560 |
| Hugo Oreno | 11,600 quetzales (H. Oreno Aff. ¶¶ 12, 16) | $1,624 |
| Carlos Pinto | 10,000 quetzales (C. Pinto Aff. ¶ 10) | $1,300 |
| Hector Rodas Lopez | 13,000 quetzales (H. Rodas Aff. ¶ 10) | $1,690 |
| Luis Amilcar Rodriguez | 8,000 quetzales (L. Rodriguez Aff. ¶¶ 9-10) | $1,040 |

## D.  Interest

Plaintiffs seek to recover pre-judgment interest on their awards of compensatory damages enumerated.  Because no federal statute sets the rate of pre-judgment interest, and because the Second Circuit has not specified a single preferred approach, the question "is left to the discretion of the district court." *Atlantic Mut. Ins. Co. v. Napa Transp., Inc.*, 399 F. Supp. 2d 523, 527 (S.D.N.Y. 2005), *aff'd*, 2006 WL 2918940 (2d Cir. 2006); *accord Shorter v. Hartford Financial Services Group Inc.,* No. 03-0149, 2005 U.S. Dist. LEXIS 19902, *23 (D. Conn. 2005).  In exercising this discretion, courts use a variety of calculations.  Some have used state statutory interest rates or prime market rates.  *See, e.g., Mentor Ins. Co. v. Brannkasse*, 996 F.2d

---

[24] The amounts of Plaintiffs' loans have been converted to U.S. dollars using historical exchange rates, reflecting the approximate date on which their loans were undertaken.  For the "March Plaintiffs," this exchange rate is 0.13 dollars per quetzal, recorded on March 11, 2006 (one week before their travel to the United States). For the "April Plaintiffs," this exchange rate is 0.14 dollars per quetzal, recorded on April 5, 2006 (one week before their travel to the United States).  In these calculations, Plaintiffs' counsel have relied upon the interbank exchange rates recorded online at http://www.oanda.com/.

[25] At the time of filing this Motion, Plaintiffs' counsel have not yet executed a final affidavit with this Plaintiff. Therefore, the amount of debt he incurred is unknown.  Counsel will file a supplemental affidavit as soon as feasible.

[26] *Id.*

506, 520 (2d Cir. 1993) (upholding district court's award of 9% prejudgment interest rate, as recommended by special master, in admiralty case); *Shaw v. Greenwich Anesthesiology Assocs., P.C.,* 200 F. Supp. 2d 110, 119 (D. Conn. 2002) (applying prejudgment interest rate of 7.5% in employment discrimination case); *Malarkey v. Texaco*, Inc., 794 F. Supp. 1237, 1243 (S.D.N.Y. 1992) (applying New York State statutory rate of 9% in employment discrimination case), *aff'd,* 983 F.2d 1204 (2d Cir. 1993).

Other courts have relied upon the federal *post*-judgment interest rate codified at 28 U.S.C. § 1961. *See, e.g., Atlantic Mut. Ins. Co.,* 399 F. Supp. 2d at 527 (applying federal post-judgment interest rate, instead of New York State's statutory pre-judgment rate, in insurance case where there was "no connection to New York which would counsel in favor of applying [the state] rate"); *Shorter,* 2005 U.S. Dist. LEXIS 19902 (D. Conn. 2005) (applying federal post-judgment rate to front- and backpay award under Title VII). Notably, the Second Circuit has emphasized that "prejudgment interest *is not limited* to [the federal post-judgment] rate." *Jones v. UNUM Life Ins. Co. of America*, 223 F.3d 130, 139 (2d Cir. 2000) (internal citations omitted; emphasis added). Rather, "the rate for an award of prejudgment interest will depend on the circumstances of the individual case." *Id.* The guiding principle is that such interest "is intended to make the injured party whole." *N.Y. Marine & Gen. Ins. Co. v. Tradeline L.L.C.*, 266 F.3d 112, 131 (2d Cir. 2001) (internal quotations omitted).

Given the burdensome interest rates on the loans that several Plaintiffs were forced to undertake in Guatemala in order to finance their travel to the United States, Plaintiffs request that this Court apply Connecticut's statutory pre-judgment interest rate of 10% per annum, Conn. Gen. Stat. § 37-3a, to their award of compensatory damages under their Guatemala Fraud claim (Claim 7) and Guatemalan Labor Law (Claim 20). *See Stephan v. Pennsylvania Gen. Ins. Co.*,

224 Conn. 758, 765 (1993) (imposing prejudgment interest under Conn. Gen. Stat. § 37-3a for the wrongful detention of money); *Patron v. Konover*, 35 Conn. App. 504, 517 (1994) (same). Plaintiffs recognize that this Court is not required to award them pre-judgment interest at the rate at which Plaintiffs actually borrowed money during the period of their injury. *Indep. Bulk Transport, Inc. v. Vessel "Morania Abaco,"* 676 F.2d 23, 27 (2d Cir. 1982). However, keeping in mind the "make-whole" purpose of pre-judgment interest, Plaintiffs submit that the Connecticut statutory rate will more adequately compensate them for the costs they incurred as a result of Defendants' fraud than would the lower federal post-judgment rate. *See Mentor Ins. Co. v. Brannkasse*, 996 F.2d 506, 520 (2d Cir. 1993).

Plaintiffs' expenses associated with the Guatemala Fraud (reflecting the costs of plane tickets, visa and passport fees, travel money, and money to support their families in their absence), plus interest from the dates those expenses were incurred, are as follows:

| **Plaintiff** | **Total amount of debt incurred as a result of Defendants' fraud** | **Amount of loan in U.S. dollars[27]** | **Approximate start date of loan** | **Principal plus interest (10% per annum, compounded annually[28])** |
|---|---|---|---|---|
| Alexander Aguilar | 10,000 quetzales (A. Aguilar Aff. ¶ 13) | $1,400 | April 5, 2006 | $1,663.09 |
| Carlos Aguilar | 27,000 quetzales (C. Aguilar Aff. ¶ 10) | $3,510 | March 11, 2006 | $4,195.17 |
| Leopoldo Santos Catu | --[29] | -- | March 11, 2006 | -- |
| Santos Chajchaguin | --[30] | -- | March 11, 2006 | -- |
| Marvin Coto | 33,000 quetzales (M. Coto Aff. ¶ 8) | $4,290 | March 11, 2006 | $5,127.43 |
| Esteban Espinoza | 17,000 quetzales (E. Espinoza Aff. ¶ 9) | $2,210 | March 11, 2006 | $2,641.40 |
| Walter Hernandez | 18,000 quetzales (W. Hernandez Aff. ¶ 8-9) | $2,340 | March 11, 2006 | $2,796.78 |
| Angel Mendoza | 12,000 quetzales (A. Mendoza Aff. ¶ 17) | $1,560 | March 11, 2006 | $1,864.52 |
| Hugo Oreno | 11,600 quetzales (H. Oreno Aff. ¶¶ 12, 16) | $1,624 | April 5, 2006 | $1,929.19 |
| Carlos Pinto | 10,000 quetzales (C. Pinto Aff. ¶ 10) | $1,300 | March 11, 2006 | $1,553.77 |
| Hector Rodas Lopez | 13,000 quetzales (H. Rodas Aff. ¶ 10) | $1,690 | March 11, 2006 | $2,019.90 |
| Luis Amilcar Rodriguez | 8,000 quetzales (L. Rodriguez Aff. ¶¶ 9-10) | $1,040 | March 11, 2006 | $1,243.01 |

[27] The amounts of Plaintiffs' loans have been converted to U.S. dollars using historical exchange rates, reflecting the approximate date on which their loans were undertaken. For the "March Plaintiffs," this exchange rate is 0.13 dollars per quetzal, recorded on March 11, 2006 (one week before their travel to the United States). For the "April Plaintiffs," this exchange rate is 0.14 dollars per quetzal, recorded on April 5, 2006 (one week before their travel to the United States). In these calculations, Plaintiffs' counsel has relied upon the interbank exchange rates recorded online at http://www.oanda.com/.

[28] For Plaintiffs' counsel's interest rate calculations, see Exhibit AA attached to the Hallett Decl. *See also Harris v. Harris*, 2007 Conn. Super. LEXIS 2580, *3-4 (Oct. 2, 2007) (finding that prejudgment interest under § 37-3a should be compounded yearly in case involving bad faith).

[29] *See supra* note 25.

[30] *See supra* note 26.

For all Plaintiffs' other compensatory damages—those recoverable under their "forced labor" and "human trafficking"—Plaintiffs seek pre-judgment interest at the federal post-judgment rate specified in 28 U.S.C. § 1961.

Where a federal statute is silent as to the availability of pre-judgment interest, courts in the Second Circuit look to the framework set forth in *Wickham Contracting Co., Inc. v. Local Union No. 3, IBEW*, 955 F.2d 831, 833-834 (2d Cir. 1992).  In *Wickham,* the Second Circuit held that a district court's decision to award prejudgment interest should be a function of:

> (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.

*Id.  See also Barcia v. Sitkin,* No. 79-5831, 1997 U.S. Dist. LEXIS 1611, *12 (S.D.N.Y. Feb. 14, 1997) (applying the *Wickham* test).  Because the TVPA and ATCA (on which Plaintiffs' "forced labor" and "human trafficking" theories of recovery are largely based) are remedial statutes intended to make whole the victims of trafficking and other extreme human rights abuses, Plaintiffs submit that federal statutory post-judgment interest rate is appropriate as a pre-judgment interest rate here.

Interest under section 1961 is calculated by looking to the weekly average one-year constant maturity Treasury yield, as published by the Federal Reserve System, for the calendar week preceding the date of the judgment.  *Gatti v. Community Action Agency of Greene County, Inc.*, 263 F. Supp. 2d 496, 524 (N.D.N.Y. 2003).  Having ascertained that weekly average—in this case, 2.83%, recorded for the week ending January 18, 2008[31]—calculating interest involves three steps:

---

[31]   Federal   Reserve   Statistical   Release,   Selected   Interests   Rates   (Jan.   22,   2008),   at http://www.federalreserve.gov/releases/h15/Current/ (last visited Jan. 23, 2008).

> [F]irst, the award should be divided pro rata over the appropriate time period; second, once award is divided, average annual United States treasury bill rate of interest will be applied; and finally, in order to guarantee complete compensation to plaintiff, interest will be compounded annually.

*Gatti,* 263 F.Supp.2d at 524; *see also Shorter,* 2005 WL 2234507, at *5-7 (D. Conn. May 31, 2005) (applying same methodology).

Accordingly, Plaintiffs seek recovery of their compensatory damages (excluding punitive damages) under "human trafficking" and "forced labor" as follows:

| Plaintiff | Forced Labor | Human Trafficking | Total Compensatory Damages | Compensatory Damages Plus Interest |
|---|---|---|---|---|
| Alexander Aguilar | $126,000 | $100,000 | $226,000 | $237,503.76 |
| Carlos Aguilar | $30,000 | $100,000 | $130,000 | $136,866.42 |
| Leopoldo Santos Catu | $120,000 | $100,000 | $220,000 | $231,620.10 |
| Santos Chajchaguin | $174,000 | $100,000 | $274,000 | $288,472.30 |
| Marvin Coto | $174,000 | $100,000 | $274,000 | $288,472.30 |
| Esteban Espinoza | $30,000 | $100,000 | $130,000 | $136,866.42 |
| Walter Hernandez | $174.000 | $100,000 | $100,174 | $288,472.30 |
| Angel Mendoza | $174,000 | $100,000 | $274,000 | $288,472.30 |
| Hugo Oreno | $126,000 | $100,000 | $226,000 | $237,503.76 |
| Carlos Pinto | $30,000 | $100,000 | $130,000 | $136,866.42 |
| Hector Rodas Lopez | $30,000 | $100,000 | $130,000 | $136,866.42 |
| Luis Amilcar Rodriguez | $174,000 | $100,000 | $274,000 | $288,472.30 |

### E. Total Damages

In sum, the Plaintiffs seek the following damages: compensatory damages for forced labor and human trafficking violations with interest, punitive and/or statutory damages for these same violations, and pecuniary damages compensating plaintiffs for costs relating to their recruitment with interest.  Each Plaintiff seeks an award as follows:

| Plaintiff | Total Compensatory Damages Plus Interest | Total Punitive and/or Statutory Damages | Pecuniary Damages Plus Interest | Total Award Sought |
|---|---|---|---|---|
| Alexander Aguilar | $237,503.76 | $452,000 | $1,663.09 | **$691,166.85** |
| Carlos Aguilar | $136,866.42 | $260,000 | $4,195.17 | **$401,061.59** |
| Leopoldo Santos Catu | $231,620.10 | $440,000 | -- | **$671,620.10** |
| Santos Chajchaguin | $288,472.30 | $548,000 | -- | **$836,472.30** |
| Marvin Coto | $288,472.30 | $548,000 | $5,127.43 | **$841,599.73** |
| Esteban Espinoza | $136,866.42 | $260,000 | $2,641.4 | **$399,507.82** |
| Walter Hernandez | $288,472.30 | $548,000 | $2,796.78 | **$839,269.08** |
| Angel Mendoza | $288,472.30 | $548,000 | $1,864.52 | **$838,336.82** |
| Hugo Oreno | $237,503.76 | $452,000 | $1,929.19 | **$691,432.95** |
| Carlos Pinto | $136,866.42 | $260,000 | $1,553.77 | **$398,420.19** |
| Hector Rodas Lopez | $136,866.42 | $260,000 | $2,019.90 | **$398,886.32** |
| Luis Amilcar Rodriguez | $288,472.30 | $548,000 | $1,234.01 | **$837,706.31** |
| Total | $2,696,454.80 | $5,124,000 | $$19,167.00 | $7,845,480.06 |

## <u>CONCLUSION</u>

Plaintiffs respectfully request that this court enter default judgments, jointly and severally, against defendants William Forero, Hernando Aranda, and Pro Tree LLC in an amount totaling $7,841,418.80.


Dated: January 24, 2008                    _____

<div style="margin-left: 40%;">

Michael J. Wishnie, ct27221
Supervising Attorney
Amanda Aikman
Katherine Desormeau
Nicole Hallett
Paul Hughes
Law Student Interns
Jerome N. Frank Legal Services Organization
Yale Law School
127 Wall St.
New Haven, CT 06511
(203) 432-4800

</div>

76